# United States Court of Appeals
## For the First Circuit

No. 18-1513

UNITED STATES OF AMERICA,

Appellee,

v.

SIDNEY P. KILMARTIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron, Selya, and Boudin,
Circuit Judges.

Jamesa J. Drake, with whom Drake Law LLC was on brief, for appellant.
Benjamin M. Block, Assistant United States Attorney, with whom Halsey B. Frank, United States Attorney, was on brief, for appellee.

December 6, 2019

**SELYA**, **Circuit Judge**. This appeal arises against the backdrop of a criminal scheme that was as cruel as it was cynical. When the scheme came to light, a federal grand jury sitting in the District of Maine charged defendant-appellant Sidney P. Kilmartin with an array of offenses. The defendant pleaded guilty to nine fraud-related counts and went to trial on the remaining six counts of the superseding indictment (one charging mailing injurious articles resulting in death, see 18 U.S.C. § 1716; two charging wire fraud, see id. § 1343; one charging mail fraud, see id. § 1341; one charging witness tampering, see id. § 1512; and one charging witness retaliation, see id. § 1513). The jury found the defendant guilty on five of the six tried counts, acquitting him of witness retaliation. The district court denied the defendant's post-trial motion for judgment of acquittal and/or a new trial. It then sentenced him to concurrent terms of immurement on the fourteen counts of conviction.

In this venue, the defendant raises a golconda of issues. We hold that the evidence was sufficient to convict on the tried "mailing injurious articles" and witness tampering counts (counts 1 and 14). With respect to those counts and the fraud-related counts involving Denton (counts 5, 7, and 12), all of which were tried, we hold that the district court abused its discretion in admitting highly charged evidence having powerfully prejudicial effect but scant probative value. Given the strength of the

government's evidence of guilt, this error, though egregious, was harmless as to most of the tried counts. However, as to count 14 (the witness tampering count) the error was not harmless, and we order a new trial on that count. Finally, we reject the defendant's claim of sentencing error. The tale follows.

## I. BACKGROUND

We briefly rehearse the background and travel of the case, taking the facts in the light most congenial to the government, consistent with record support. See, e.g., United States v. Singh, 222 F.3d 6, 8 (1st Cir. 2000).

In September of 2012, the defendant falsely posed as a commercial goldsmith to order one hundred grams (at least five hundred lethal doses) of ninety-eight percent pure potassium cyanide (cyanide) from a California vendor. The cyanide cost him about $127. Because the vendor would not ship the cyanide to a residential address, the defendant had it sent to a UPS store in Augusta, Maine. He retrieved the merchandise on the day that it arrived.

The defendant's next step was to create a Gmail account, which allowed him to blog. He proceeded to post, on a website for suicidal people called "wantdeathblogspot," that he had industrial-grade cyanide for sale. From around September of 2012 until approximately May of the following year, the defendant exchanged cyanide-related emails with people all over the world,

- 3 -

including Australia, Canada, India, Nigeria, South Africa, the United Kingdom, and the United States. A subsequent search of the defendant's Gmail account revealed 484 email strings from about 274 unique email addresses. In these emails, the defendant agreed to sell cyanide to several persons from whom he received payments ranging from $150 to $250. But there was a rub: instead of mailing cyanide to these purchasers, the defendant sent them Epsom salts (which he represented to be cyanide).

One of the defendant's duped customers was Andrew Denton of Hull, England. According to his niece, Denton "was just adamant that he wanted to commit suicide." Denton ordered cyanide from the defendant, who mailed Epsom salts to him on November 16, 2012. The parcel arrived at the end of November, and Denton ingested the substance in an effort to kill himself. The attempt failed, and an irate Denton complained to the FBI Internet Crime Complaint Center (IC3).

In his complaint, Denton described his dealings with the defendant, noting that what he received could not have been cyanide since "[i]t did not work." Denton also advised the defendant about the IC3 complaint. On December 8, 2012, the defendant emailed Denton, mentioned the possibility of a second shipment, and described how Denton could order cyanide directly from the California vendor "if all else fails." The following day, Denton updated his IC3 complaint, stating that his issue had been resolved

and he did not wish to pursue his complaint.  Two days later, the defendant mailed a second parcel to Denton.

The second parcel, which actually contained cyanide, arrived on December 20.  That same day, the defendant emailed Denton asking if Denton could "do something" with his hard drive "before [his] event."  Expressing concern about the FBI being "aware of [his] goings on," the defendant stated that "the last thing" he needed was "to give [the FBI] more fodder."  Denton replied that he would delete their emails, explained his understanding that the IC3 complaint would remain open but inactive for three months, and expressed his hope that the cyanide would "work[] this time."  Denton's niece found him dead on December 31.  Subsequent toxicological examination disclosed lethal levels of cyanide in his blood.

Notwithstanding Denton's effort to retract his complaint, the FBI continued its investigation.  This probe ripened into an indictment and — in December of 2015 — the grand jury returned a superseding indictment.  Count 1 limned the "mailing injurious articles" charge; counts 2 through 13 charged wire and mail fraud offenses (based on a scheme to defraud suicidal people and to obtain money by false pretenses, specifically, by pretending to sell cyanide but sending Epsom salts instead);[1] count 14 charged

---

[1] Three of these fraud counts related to the defendant's initial transaction with Denton.  The remainder related to the

- 5 -

the defendant with witness tampering, that is, with killing Denton knowingly, intending to prevent his testimony in an official proceeding and to prevent him from communicating information related to the possible commission of a federal offense to a law enforcement officer; and count 15 charged the defendant with witness retaliation, that is, killing Denton to retaliate for Denton's supplying of information to IC3 regarding the commission of a federal offense.

The defendant's trial was scheduled to start on October 3, 2016. That morning, the defendant entered guilty pleas to the nine non-Denton counts. The trial went forward on the remaining six counts. Four of the defendant's fraud victims testified for the government (including one as to whom the defendant's fraud had not been charged). A victim's grandmother also testified at the government's behest about the uncharged fraud perpetrated against her minor granddaughter. In addition, the government introduced testimony from a British detective about yet another victim.

When the trial concluded, the jury convicted the defendant on all the tried counts, save for count 15 (witness retaliation). In post-trial proceedings, the defendant moved for

---

defendant's communication with, receipt of payment from, and mailing Epsom salts to four other victims of the scheme. We sometimes refer to the counts involving these four victims, collectively, as the non-Denton counts and to victims of the scheme, other than Denton, as non-Denton victims.

judgments of acquittal on counts 1 and 14 due to allegedly insufficient evidence. See Fed. R. Crim. P. 29(c). In the same motion, he sought a new trial on all of the tried counts of conviction based on claimed evidentiary error. See id. R. 33. The district court denied the motion in all its aspects. It then sentenced the defendant to twenty years of incarceration (the statutory maximum) on each fraud-related count and twenty-five years of incarceration on counts 1 and 14, stipulating that all of the sentences were to run concurrently. This timely appeal followed.

## II. ANALYSIS

The defendant's asseverational array contains three main parts. First, he argues that the district court erred in refusing to order judgments of acquittal on counts 1 and 14. Second, he argues that the district court should have excluded certain evidence and that the failure to do so unfairly prejudiced the jury against him, necessitating a new trial on all the tried counts that resulted in convictions. Third, he alleges sentencing error as to the sentences imposed on the fraud-related counts. We address these arguments below.

Before undertaking our analysis, we pause to confirm that we review the district court's denial of a motion for judgment of acquittal de novo. See United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001). Where, as here, the defendant challenges the

sufficiency of the evidence, all of the proof "must be perused from the government's perspective."  Id.  A reviewing court must determine whether that evidence, including the plausible inferences therefrom, "enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."  Id. (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)).  The court need not be convinced that the verdict is correct; it need only be satisfied that the verdict is supported by the record.  See id.

Although the defendant's motion for judgment of acquittal targets both count 1 and count 14, the circumstances attendant to this appeal counsel in favor of bifurcating our inquiry.  Thus, we treat separately each of the targeted counts.

## A. **Judgment of Acquittal:  Count 1.**

It is not possible to address the motion for judgment of acquittal on count 1 in a vacuum.  First, we must resolve a threshold issue.  Only then can we turn to the merits of the request for an acquittal.  Specifically, we must resolve an apparent discrepancy between the indictment and the proof at trial.

1. **Constructive Amendment.**  As stated in the superseding indictment, count 1 charged the defendant with a misdemeanor (mailing nonmailable poison), together with an enhancement for "death resulting."  The indictment itself did not allude to a mens rea requirement.  At trial, though, the parties and the district

court approached count 1 as if it charged a felony under a different paragraph of the "mailing injurious articles" statute. That paragraph requires the government to show that the defendant had mailed an injurious article with the intent to kill or injure another. The government labored to prove this intent at trial, both parties requested that the district court instruct the jury on this intent element, and the district court obliged. As explained below, this series of events added up to a constructive amendment of count 1.

"A constructive amendment occurs when the charging terms of an indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. McIvery, 806 F.3d 645, 652 (1st Cir. 2015) (quoting United States v. Brandao, 539 F.3d 44, 57 (1st Cir. 2008)). Constructive amendments have Fifth and Sixth Amendment implications. See id. These implications typically arise from "a mismatch between the indictment's description of the charged offense and some other variable," such as the evidence offered, the jury instructions given, or the sentence imposed. Id.

In this instance, the statute of conviction provides in relevant part:

> (1) Whoever knowingly deposits for mailing or delivery . . . anything declared nonmailable by this section, unless in accordance with the rules and regulations authorized to be prescribed by the Postal

- 9 -

Service, shall be fined under this title or imprisoned not more than one year, or both.

(2) Whoever knowingly deposits for mailing or delivery . . . anything declared nonmailable by this section, whether or not transmitted in accordance with the rules and regulations authorized to be prescribed by the Postal Service, with intent to kill or injure another . . . shall be fined under this title or imprisoned not more than twenty years, or both.

(3) Whoever is convicted of any crime prohibited by this section, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life.

18 U.S.C. § 1716(j). Count 1 of the superseding indictment, by its terms, charged the defendant with the misdemeanor offense described in (j)(1) along with the sentencing enhancement described in (j)(3):

[T]he defendant . . . knowingly deposited for mailing and delivery something declared nonmailable . . . not in accordance with rules and regulations prescribed by the United States Postal Service, in other words, potassium cyanide, a poison, which resulted in the death of a person . . . . All in violation of 18 U.S.C. § 1716(j)(3).

At trial, however, the parties and the district court treated count 1 as if the offense was charged under (j)(2) and (j)(3), not (j)(1) and (j)(3).[2] During its preliminary instructions, the district court told the jurors that in order to find the defendant guilty

---

[2] Although the record is tenebrous as to the reason for this shift in focus, we note that the original indictment (later superseded) clearly charged the defendant with violating paragraph (j)(2).

under count 1, they had to find, among other things, that the defendant acted "with the intent to kill or injure another."  The jury instructions proposed by both the government and the defendant included this "intent to kill or injure another" element.  Not surprisingly, then, the district court mirrored this language in defining the elements of count 1 when it charged the jury.

Although the constructive amendment of an indictment may constitute grounds for reversal of a conviction, see United States v. Bucci, 525 F.3d 116, 131 (1st Cir. 2008); cf. McIvery, 806 F.3d at 651 (reviewing unpreserved claim of constructive amendment for plain error), the defendant has not raised this issue on appeal (or, for that matter, in the district court).  Except in rare instances — and this is not one of them — we have no duty to raise arguments for a party who has not seen fit to raise those arguments himself.  See, e.g., United States v. Flete-Garcia, 925 F.3d 17, 38 (1st Cir.), cert. denied, No. 19-5757, 2019 WL 5150648 (U.S. Oct. 15, 2019); cf. United States v. Mercado-Flores, 872 F.3d 25, 28 (1st Cir. 2017) (noting appellate court's obligation to raise jurisdictional issues sua sponte).  At any rate, the constructive amendment did not prejudice the defendant in any respect because it had the effect of adding another element that the government was required to prove beyond a reasonable doubt.  We therefore conclude that count 1 was constructively amended with the implied consent of the parties.  We proceed accordingly.

2. **The Merits.**  Having ironed out this wrinkle, we now reach the question of whether the evidence was sufficient to support the defendant's conviction on count 1 (as constructively amended).  To begin, it is important to note that the defendant challenges the sufficiency of the evidence only with respect to the "death resulting" element of the offense.  He contends that his conduct was neither the actual nor the proximate cause[3] of Denton's death because Denton voluntarily took his own life.

The defendant's conduct is an actual, but-for cause of harm when that harm would not have occurred without it.  See United States v. Ortiz-Carrasco, 863 F.3d 1, 5 (1st Cir. 2017) (concluding that defendant's conduct was but-for cause of victim's drowning where defendant embarked on voyage on overcrowded yola, traveled in rough seas in the dark, and had no safety equipment aboard).  But-for causation is often regarded as "the minimum requirement for a finding of causation."  Id. (emphasis in original) (quoting Burrage v. United States, 134 S. Ct. 881, 888 (2014)).  A defendant's conduct can be a but-for cause of harm even when it

_____

[3] The defendant's briefing on this point is confusing.  For instance, his reply brief indicates that this "case is about actual causation, not . . . proximate causation."  Yet his opening brief contends at some length that Denton's own conduct "was an intervening and superseding cause" of Denton's death.  In fairness to the defendant, we think that this latter argument remains in the case — and it is steeped in the language of proximate cause.  See, e.g., 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(c) (3d ed. 2018).

combines with other independent causes.  See Burrage, 134 S. Ct. at 888.  As Justice Scalia explained:  "if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived."  Id.

Appraising the evidence in the light most favorable to the government, it was more than sufficient to ground a finding that the defendant's conduct was a but-for cause of Denton's demise.  The jury saw the empty beaker and the mailer with the defendant's return address recovered from Denton's home, and it heard evidence of test results indicating that the residue in the mailer was cyanide.  So, too, the jury heard evidence that a lethal quantity of cyanide had been discovered in Denton's blood.  Finally, the jury heard testimony from investigators who had determined Denton's death to be a suicide and had ruled out other causes of death.  If the defendant had not sent Denton a deadly dose of cyanide, the defendant could not have ingested it and died.  No more was exigible to ground a finding that the defendant's conduct was a but-for cause of Denton's death.

The defendant rejoins that this conception of the chain of causation is too "literal" and that Denton's actions in mixing and ingesting the poison were intervening events that broke the but-for causal connection.  This rejoinder blinks reality.

Although Denton's desire to end his life surely played a part in his suicide, he would not have been successful but for the defendant's provision of cyanide. Viewing the evidence in the requisite light, a rational factfinder could conclude — as this jury did — that the defendant actually caused Denton's death.

In an effort to change the trajectory of the debate, the defendant tries to invoke the rule of lenity. Marshaling a sampling of cases in which defendants were charged with mailing explosives under 18 U.S.C. § 1716, see, e.g., United States v. Caraway, 534 F.3d 1290, 1292-93 (10th Cir. 2008), the defendant baldly asserts that Congress did not intend the statute to cover cases of assisted suicide. This assertion is belied by the broad sweep of the language that Congress employed. Arraying the evidence favorably to the government — as we must — the defendant's actions fall squarely within the four corners of the conduct that the text of the statute proscribes.

Undaunted, the defendant claims that the rule of lenity requires construing the statute, notwithstanding its text, to exclude the conduct with which he was charged. This is wishful thinking. The rule of lenity only requires reading a criminal statute in the accused's favor when that statute is so unclear that courts are left to guess what Congress intended. See United States v. Ahlers, 305 F.3d 54, 62 (1st Cir. 2002). To engage the gears of the rule, the lack of clarity must be genuine: "a statute

- 14 -

is not ambiguous simply because litigants . . . question its interpretation." Id.

The defendant argues that section 1716 is ambiguous because (in his view) it is meant to cover things like bombs (which are mailed to unwitting victims and kill immediately), not things like the cyanide (which he mailed to a person who specifically requested it and which kills only after some further act, such as ingestion). The text of the statute of conviction does not give this argument as much as a shred of support. As written, the statute has a plain and plausible meaning. It unambiguously prohibits mailing not only things like bombs but also poisons, insects, and scabs (which do not necessarily kill immediately). The sentencing enhancement applies whenever mailing such an injurious article "result[s] in the death" of a person. That enhancement, read in context, is not ambiguous and does not permit the distinction that the defendant attempts to insinuate into it. In short, both the superseding indictment (as constructively amended) and the government's proof bring count 1 comfortably within the statute's well-defined reach. And because we discern no relevant ambiguity, we find no basis for resorting to the rule of lenity. See id.

As a fallback, the defendant attempts to argue that the proper measure of causation was proximate cause (a more rigorous standard). See, e.g., Paroline v. United States, 134 S. Ct. 1710,

- 15 -

1719 (2014). This argument, though, is foregone. During the charge conference, a protracted discussion ensued about the propriety of a but-for causation instruction as the appropriate means of establishing the "death resulting" element under count 1. Defense counsel told the court that he could not "argue that it isn't the law." The district court proceeded to instruct on but-for causation, and the defendant neither interposed an objection nor asked for a proximate cause instruction. Cf. Fed. R. Crim. P. 30 (providing that parties may request specific instructions at or before close of evidence and must object to instructions given before jury retires to deliberate).

"We have made it luminously clear that '[a] party waives a right when he intentionally relinquishes or abandons it.'" United States v. Orsini, 907 F.3d 115, 119 (1st Cir. 2018) (alteration in original) (quoting United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002)). As a general rule, waived claims are unreviewable on appeal. See id. In this instance, the defendant waived any entitlement to a proximate cause instruction. What happened here falls comfortably within the general rule of unreviewability, not within the long-odds exception to that rule. See id. at 120-21. By explicitly acquiescing in the appropriateness of a but-for causation standard, eschewing any objection to the district court's but-for causation instruction, and failing to request a proximate cause instruction, the defendant

- 16 -

waived any claim that the offense of conviction required a finding of proximate cause.

If more were needed — and we doubt that it is — "[i]t is settled that, when a cause is submitted to the jury under an instruction, not patently incorrect or internally inconsistent, to which no timely objection has been lodged, the instruction becomes the law of the case." United States v. Gomes, 969 F.2d 1290, 1294 (1st Cir. 1992); see United States v. Zanghi, 189 F.3d 71, 77-80 (1st Cir. 1999) (concluding that jury instruction increasing level of intent required to convict was "patently erroneous" and did not become the law of the case). That is precisely the situation here: the district court's treatment of causation in its charge to the jury was neither patently incorrect nor internally inconsistent. The court instructed on but-for causation, consistent with case law interpreting similarly worded "results" elements in other criminal statutes. See, e.g., United States v. Webb, 655 F.3d 1238, 1250, 1255-56 (11th Cir. 2011) (18 U.S.C. § 1347(a) and 21 U.S.C. § 841(b)(1)(C)); United States v. De La Cruz, 514 F.3d 121, 137-38 (1st Cir. 2008) (21 U.S.C. § 841(b)(1)(A)); cf. United States v. Pacheco, 489 F.3d 40, 46-47 (1st Cir. 2007) (interpreting USSG §5K2.2's authorization of upward departure when significant physical injury resulted from commission of offense of conviction). Thus, all roads lead to Rome: whether we examine the defendant's proximate cause argument in terms of waiver or

law-of-the-case doctrine, a conviction on count 1 required the government to prove no more than but-for causation.

The final piece of the puzzle falls easily into place. As we already have elaborated, the jury had ample evidence from which to find that the defendant's conduct was the but-for cause of Denton's death. Consequently, the district court did not err in denying the defendant's motion for judgment of acquittal with respect to count 1.

### B. **Judgment of Acquittal:   Count 14.**

The defendant also challenges the denial of his motion for judgment of acquittal with respect to count 14 (the witness tampering count). In his view, the evidence on this count was insufficient for two reasons. First, he contends that the government's proof was inadequate because it did not show that his conduct actually or proximately caused Denton's death. Second, he contends that the evidence was inadequate to show that he "killed" Denton within the purview of the statute of conviction. We address each contention in turn.

The statute of conviction provides in relevant part:

> (a)(1) Whoever kills or attempts to kill another person, with intent to —
>> (A)   prevent   the   attendance   or testimony of any person in an official proceeding; [or]
>> . . .
>> (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information

- 18 -

> relating to the commission or possible
> commission of a Federal offense . . .

shall be punished as provided [by law].

18 U.S.C. § 1512.  In order to convict the defendant under section 1512(a)(1)(C), the government had to prove a killing aimed at preventing a communication to a federal law enforcement officer about the commission or possible commission of a federal crime. See Fowler v. United States, 563 U.S. 668, 672 (2011).  The defendant's initial complaint about evidentiary insufficiency is narrowly focused.  He says that the government failed to prove the requisite causation.  We already have rejected the defendant's argument that no reasonable jury could have found that his conduct was a but-for cause of Denton's death, see supra Part II(A)(2), and no useful purpose would be served by repastinating that ground.

The remaining pieces of the defendant's causation argument — that proof of proximate cause was required to sustain a conviction under 18 U.S.C. § 1512(a)(1) and that such proof was lacking here — fare no better.  Importantly, the district court did not give any specific instruction on causation (nor was it asked to do so).  Instead, the court charged the jury that to convict on count 14, it simply had to find "[f]irst, that . . . [the defendant] knowingly killed [Denton]; and second, that [the defendant] did so with the intent to prevent a communication about the commission of a federal offense to a federal law enforcement

officer."  Inasmuch as the defendant did not object to this instruction, his claim of error is forfeited, and our review is for plain error.[4]  See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).  Such review requires four showings:  "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id.  The proponent of plain error (here, the defendant) must carry the devoir of persuasion as to each of these four components.  See United States v. Brown, 235 F.3d 2, 4 (1st Cir. 2000).

When a crime specifies both conduct and result elements, a defendant ordinarily may not be convicted unless his conduct is both the but-for and the proximate cause of the result.  See Burrage, 134 S. Ct. at 887 (citing 1 Wayne R. LaFave, Substantive Criminal Law § 6.4(a) (2d ed. 2003); Model Penal Code § 2.03 (Am. Law Inst. 1985)).  As to count 14, the statute of conviction is silent regarding the nature of the requisite causal nexus.  See 18

---

[4] While the defendant neither objected to the court's instruction nor requested a proximate cause instruction with respect to count 14, these circumstances differ from those surrounding count 1.  With respect to the latter count, the defendant expressly agreed that but-for causation sufficed to convict.  Yet he made no such representation with respect to count 14.  The absence of such an express representation explains why we treat his argument vis-à-vis count 14 as forfeited, not waived. See Rodriguez, 311 F.3d at 437 (explicating distinction between forfeited claims and waived claims).

U.S.C. § 1512(a)(1). We are cognizant, though, that the Supreme Court on several occasions has found a proximate cause requirement built into a statute that did not explicitly impose such a requirement. See Paroline, 134 S. Ct. at 1720 (collecting cases). Proximate causation sets a higher bar than but-for causation, demanding "some direct relation between the injury asserted and the injurious conduct alleged." Id. at 1719 (quoting CSX Transp., Inc. v. McBride, 564 U.S. 685, 707 (2011) (Roberts, C.J., dissenting)).

It is an interesting question whether section 1512(a)(1) demands proof of proximate causation as opposed to some lesser strain of causation. But courts should not rush to answer unsettled questions, see Privitera v. Curran (In re Curran), 855 F.3d 19, 22 (1st Cir. 2017), and this question is one that we need not answer. Even assuming (as the government concedes) that the statute of conviction requires a showing of proximate cause, it is neither clear nor obvious that the evidence in this case is insufficient to sustain the conviction on count 14. We explain briefly.

Viewing the evidence in the light most hospitable to the government, a rational jury could find that the defendant's conduct proximately caused Denton's death. After all, the evidence was sufficient to support findings that the defendant, the second time around, sent real cyanide to Denton, knowing that the cyanide was

lethal and that Denton intended to ingest it; that Denton received the cyanide; that Denton swallowed it; and that he died as a result. Proximate cause is commonly understood as a function of the foreseeability of the harm. See, e.g., United States v. Chiaradio, 684 F.3d 265, 284 (1st Cir. 2012) ("The evidence must show that the defendant's conduct created a reasonably foreseeable risk of harm to the victim, notwithstanding that others may also have contributed to that harm."). Intervening causes normally do not break the causal chain if they are foreseeable. See Paroline, 134 S. Ct. at 1719 (explaining that purpose of proximate cause requirement is to preclude liability where link between conduct and result is merely fortuitous).

Here, Denton's death was entirely foreseeable. Among other things, the defendant posted his cyanide advertisement on a suicide blog, and his avowed purpose in sending Denton genuine cyanide the second time around was to facilitate Denton's demise. On this record, we are satisfied that a rational jury could conclude that the defendant proximately caused Denton's death by mailing him cyanide with which to commit suicide.

The defendant has a fallback position as to count 14. This position hinges on the meaning of "kill" as that word is used in the statute of conviction. The defendant would have us read "kill" in that context as synonymous with "murder." But this "kill is tantamount to murder" argument is presented only in connection

with his assertion that the statute of conviction requires proof of some direct causal link between the charged conduct and Denton's death. That assertion goes nowhere: as we previously have explained, the evidence was sufficient to ground a finding that a causal relationship existed between the defendant's conduct and Denton's death.[5] See text supra. No more is exigible.

Even though the defendant eschews a mens rea attack, his comments about the meaning of "kill" might theoretically be directed to the mens rea that a defendant must possess in relation to his victim's death. See Schad v. Arizona, 501 U.S. 624, 640 (1991) (plurality opinion) ("At common law, murder was defined as the unlawful killing of another human being with 'malice aforethought.'"). The statute of conviction does not define the word "kill." And during the charge conference, neither party requested an instruction elucidating the meaning of the word. Following the parties' lead, the district court did not expound on the meaning in its jury instructions, and neither party objected.

---

[5] To like effect, the defendant contends that "resulted in," as used in the statute of conviction for count 1 (18 U.S.C. § 1716), requires the same causation as murder. The ordinary meaning of the phrase forecloses this argument. See Burrage, 134 S. Ct. at 887 (explaining that "[a] thing 'results' when it '[a]rise[s] as an effect, issue, or outcome from some action, process or design'" (second and third alterations and emphasis in original) (quoting 2 The New Shorter Oxford English Dictionary 2570 (1993))); see also De La Cruz, 514 F.3d at 137-38 (interpreting similarly worded "result" element in 21 U.S.C. § 841(b)(1)(A) as requiring only but-for causation).

Subsequent to the verdict, the defendant shifted gears and argued for the first time that, under the statutory regime, the word "kill" must be construed as synonymous with murder. Building on this foundation, he submitted that he merely supplied the means that Denton used to kill himself and did not participate in the final act. Thus, he did not "kill" Denton but, rather, merely assisted Denton's suicide.

In litigation as in life, timing is critically important. So it is here: the defendant did not develop his statutory "kill is tantamount to murder" argument until he filed his post-conviction motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c). Even then, he did not direct it at the mens rea element. Because he did not seasonably raise this mens rea argument at any time prior to the jury's verdict, his post-conviction motion cannot give it a new lease on life. See United States v. Alberico, 559 F.3d 24, 27 (1st Cir. 2009). In light of this conspicuous procedural default, the most that the defendant can expect is for us to review his late-blooming argument for plain error.[6]

---

[6] Given the defendant's decision not to brief a mens rea theory, this aspect of his argument is likely waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."), and, thus, either unreviewable or reviewable only for "clear and gross injustice," United States v. Valenzuela, 849 F.3d 477, 484 (1st Cir. 2017) (quoting United States v. Cheung, 836 F.2d 729, 730 n.1

We need not tarry. As we have said, the defendant's argument rests on the premise that "kill," as used in 18 U.S.C. § 1512(a)(1), means "murder." To support this argument, the defendant points to cases in which courts have used "murder" interchangeably with "kill" in discussing the witness tampering statute. See, e.g., Fowler, 563 U.S. at 679-80 (Scalia, J., concurring in the judgment) (using "murder" hypothetical); United States v. Burgos-Montes, 786 F.3d 92, 111-12 (1st Cir. 2015) (stating that defendant faced charges for "murdering" victim to prevent communication with law enforcement); United States v. Tyler, 732 F.3d 241, 245 (3d Cir. 2013) (similar). But judicial dicta often include imprecise shorthands. This is such an instance. Because none of the quoted statements concerns the "kill" element, those cases are of scant assistance here.

The defendant also points to section 1512's penalty provisions and specifically notes that killing a witness shall be punished as provided in 18 U.S.C. §§ 1111 and 1112. See 18 U.S.C. § 1512(a)(3)(A). Those sections, in turn, set out the penalties for first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter — penalties that range from a term of years all the way to capital punishment. The

(1st Cir. 1988) (per curiam)). Here, however, nothing turns on these distinctions, so we assume, favorably to the defendant, that review for plain error is available.

- 25 -

defendant argues that punishing violations of section 1512(a) on the level of manslaughter might make sense but that his conduct did not even meet the elements of manslaughter, as he merely "suppl[ied] the means of death" rather than murdered or killed Denton.

Even if "kill," as used in section 1512(a), means murder or manslaughter — a matter on which we express no opinion — it is neither clear nor obvious that the defendant's conduct amounted to something less than murder. "Murder is the unlawful killing of a human being with malice aforethought." Id. § 1111(a). The elements of murder require that a defendant engage in some conduct, such as an affirmative act; that he act with a malicious mens rea, such as an intent to kill; and that his conduct cause death. See 2 Wayne R. LaFave, Substantive Criminal Law § 14.1(f) (3d ed. 2018). Here, it is neither clear nor obvious that a rational jury could not conclude that the defendant acted with the intent to kill when he shipped a lethal dose of cyanide to a man whom he knew to be suicidal.

Similarly, it is neither clear nor obvious that a rational jury could not find that the defendant's conduct amounted to manslaughter (which, after all, is a lesser included offense of murder under federal law, see 18 U.S.C. § 1112(a) ("Manslaughter is the unlawful killing of a human being without malice."); United States v. Lincoln, 630 F.2d 1313, 1320 (8th Cir. 1980)). And for

what it may be worth, many states treat assisted suicide as a species of manslaughter. See, e.g., Alaska Stat. § 11.41.120; Ariz. Rev. Stat. Ann. § 13-1103; Ark. Code Ann. § 5-10-104; Colo. Rev. Stat. § 18-3-104; Conn. Gen. Stat. § 53a-56; Fla. Stat. § 782.08; Mo. Rev. Stat. § 565.023; N.Y. Penal Law § 125.15; Or. Rev. Stat. § 163.125; see also LaFave, supra, § 15.6(c).

No more need be said. For these reasons, we hold that the district court committed no reversible error in denying the defendant's motion for judgment of acquittal with respect to count 14.

## C. **Admission of Evidence.**

We proceed next to the defendant's contention that some evidence was improperly admitted. He contends that his objections should have been sustained to certain testimony from or about the non-Denton victims, as well as to Exhibit 16 — a 113-page chart containing the contents of 484 email strings, which memorialize the defendant's correspondence with persons who replied to his cyanide advertisement (including both purchasers and potential purchasers). For ease in exposition, we refer to all of this body of evidence, in the aggregate, as the "anecdotal background evidence." In the defendant's view, the anecdotal background evidence was either wholly or partially inadmissible under Federal Rule of Evidence 403.

By means of a pretrial filing, the defendant indicated that he intended to object generally to the anecdotal background evidence (specifically, to any evidence that he had swindled any victims other than those identified in the various fraud counts of the superseding indictment and, in addition, to any testimony about non-Denton victims' mental health histories). On the morning that trial began, the district court indicated that the objections — which the defendant tied so tightly at sidebar to Rule 403 that the court described this as his "real objection" — should be raised during trial. The court stated that it would make a "formal[] rul[ing]" at that time, and defense counsel would have a continuing objection from that point forward, without needing to object thereafter. The trial got underway. The first time the government sought to introduce any specific evidence about non-Denton victims, the defendant — in furtherance of the praxis prescribed by the district court — objected to Exhibit 10 (a document concerning a non-Denton victim not named in the indictment). The court nonetheless admitted the evidence and gave a limiting instruction, based on Federal Rule of Evidence 404(b), about the purposes for which the jury could consider it.

Before any more evidence about non-Denton victims was admitted (including anecdotal background evidence), the defendant sought clarification as to whether the court had provided a "definitive ruling" because he did not want to continue "being

overruled" in front of the jury and "interrupt[ing] the trial." The court replied in the affirmative and asked only that the defendant request a further limiting instruction whenever he deemed it necessary.

From then on, the parties appear to have treated the defendant's Rule 403 objection to the anecdotal background evidence as subject to a continuing objection (which we sometimes call a "blanket objection"). Reinforcing this blanket objection, the defendant objected from time to time to the admission of specific pieces of non-Denton evidence (including Exhibit 16).

Our case law has long permitted the use of blanket objections at or before trial as an efficacious means of preserving issues for appellate review. See United States v. Ladd, 885 F.2d 954, 958 (1st Cir. 1989). In determining whether a blanket objection sufficiently preserves a particular claim of evidentiary error, courts typically consider whether the trier had the opportunity to address the issue, see United States v. Simms, 757 F.3d 728, 733-34 (8th Cir. 2014); whether "[t]he substance of the objection . . . was thoroughly explored," Palmerin v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986); whether the objecting party was entitled to rely on the trier's grant of the blanket objection, see United States v. Sanchez-Hernandez, 507 F.3d 826, 831 (5th Cir. 2007); and whether testimony admitted without specific objection after a blanket objection "presented

substantially the same type of information" as testimony admitted over a specific objection, <u>id.</u>

In this instance, each of these considerations counsel in favor of concluding that the defendant's blanket objection adequately preserved his Rule 403 objection for appellate review. To begin, the district court had ample opportunity to address the objection before trial, as the defendant initially raised it weeks in advance. Moreover, the court explored the relevance and admissibility of the anecdotal background evidence at several points, confirmed that the defendant's objection was based on Rule 403, and explicitly declared that the Rule 403 balance weighed in favor of admitting the anecdotal background evidence. So, too, the defendant appears to have relied on the blanket objection; even when he lodged specific objections to particular pieces of anecdotal background evidence, he stated that he was making his "usual" objection. Finally, when the defendant did not lodge a specific objection to a specific piece of anecdotal background evidence, the information presented was substantially similar to Exhibit 16 (to which he expressly objected). Given the district court's repeated assurance both before and during trial that the defendant need not object to each reference to the anecdotal background evidence, the defendant's reliance on this assurance was reasonable.

We add a note of caution. Although blanket objections are sometimes a useful mechanism, see United States v. Cianci, 378 F.3d 71, 105 (1st Cir. 2004) (noting that "stop-and-go evidentiary evaluations" can cause delay and prejudice), trial courts should not dispense them indiscriminately, see United States v. Fortenberry, 919 F.2d 923, 924 (5th Cir. 1990); cf. Cianci, 378 F.3d at 104-05 (noting that ambiguous blanket objection may fail to preserve point for appeal). Here, however, it seems fair to the parties and the district court to give force to the blanket objection. After all, the defendant clearly stated the grounds for his objection, the government knew exactly where it stood, and the district court acted sensibly in preferring this mechanism to a steady stream of specific objections. We conclude, therefore, that the blanket objection adequately preserved the claimed evidentiary errors. See United States v. Thompson, 976 F.2d 666, 669-70 n.2 (11th Cir. 1992); Ladd, 885 F.2d at 958; see also 3B Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure § 842 (4th ed. 2013) ("If the problem has been brought to the attention of the court, and the court has indicated in no uncertain terms what its views are, to require an objection would exalt form over substance.").

With the issue preserved for review, we turn to its particulars. Notwithstanding the district court's grant of the blanket objection and the spate of follow-up objections, the court

allowed the government to call four non-Denton victims (Walter Cottle, Stacy Williams, Cynthia Kirschling, and Autumn Roland) in its case in chief.[7]  The court also permitted the government to call two other witnesses (Detective Stuart Daniel Quinn and Edith Collins) to testify about the travails of particular non-Denton victims.  Detective Quinn testified concerning Derek Jorgensen, a victim named in counts 6 and 11, and Collins testified concerning her minor granddaughter, a victim not named in the indictment.

All in all, this testimony went into excruciating detail about the non-Denton victims' personal lives, medical issues, histories of depression, earlier suicide attempts, suicidal motivations, and the like.  It was augmented, and its effect exponentially increased, by the government's introduction, over specific objection, of Exhibit 16.

Where, as here, objections to evidentiary rulings are preserved, review is for abuse of discretion.  See United States v. Sabean, 885 F.3d 27, 35 (1st Cir. 2018).  Although this standard of review is deferential, it "does not render trial court decisions impervious to scrutiny."  Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir. 1998).  As we have observed, abuse of discretion "sounds worse than it really is."  Schubert v.

_____

[7] The defendant pleaded guilty to wire and mail fraud counts involving three of these victims.  The defendant was never charged with any crimes related to his communications or transactions with the fourth victim (Roland).

- 32 -

Nissan Motor Corp. in U.S.A., 148 F.3d 25, 30 (1st Cir. 1998) (quoting In re Josephson, 218 F.2d 174, 182 (1st Cir. 1954)).  It simply means that "when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors."  Id. (quoting Josephson, 218 F.2d at 182).

Evidence is relevant as long as it has some tendency to make a fact of consequence more or less probable.  See Fed. R. Evid. 401.  In a criminal case, the government is generally "entitled to prove its case by evidence of its own choice."  Old Chief v. United States, 519 U.S. 172, 186 (1997).  But this entitlement is hedged with exceptions.  For instance, a lack of dispute or concession of a central allegation may significantly reduce the probative value of particular evidence and, thus, call its admissibility into question.  See United States v. Ford, 839 F.3d 94, 109 (1st Cir. 2016).

To ameliorate these competing concerns, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  This balance is sometimes difficult to strike.  As a practical matter, nearly all evidence is offered for the purpose of prejudicing the factfinder's views, and Rule 403 is

meant to stand as a sentinel, which can be alerted to screen out unfair prejudice. See Sabean, 885 F.3d at 38; United States v. Rodriguez-Estrada, 877 F.2d 153, 155-56 (1st Cir. 1989). Evidence presents a risk of unfair prejudice when it has "the capacity . . . to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief, 519 U.S. at 180. Put another way, unfair prejudice ensues when particular evidence "serves only to evoke an improper emotional response" and distracts "from careful consideration of the relevant issues." United States v. Fulmer, 108 F.3d 1486, 1498 (1st Cir. 1997). Although there is no blanket prohibition against the admission of such evidence, a trial court faced with an objection to its introduction must strike a delicate balance between the government's need for the evidence (that is, its probative value) and the risk that the evidence will inflame the jurors' passions (that is, its unfairly prejudicial effect). See id. at 1497-98; see also Fed. R. Evid. 403.

Assessing the totality of the relevant circumstances, we conclude that the district court abused its discretion in failing to exclude the anecdotal background evidence under Rule 403. Though marginally relevant, it had "the capacity . . . to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief, 519 U.S. at 180. A

- 34 -

few examples help to illustrate why much of this evidence was unfairly prejudicial:

- On direct examination, Cottle testified that he was so overwhelmed that he "didn't want to see [his] wife" and "didn't want to see [his] child." He "was crying probably twenty, twenty-five times a day for no reason."

- Williams testified about a myriad of factors that rendered her suicidal (including going through a "terrible" second divorce, experiencing great financial pressure, watching her neighbor shoot her dog, and undergoing a horrible car accident). She also described why she was looking for cyanide: "I knew that I didn't have the courage to shoot myself, and . . . I knew I didn't have the courage to cut myself."

- Kirschling testified that she "suffered from major depression," was lonely, "couldn't do [her] job," and was "just in constant pain."

- Roland testified that "severe distress" led her to look for cyanide after she was diagnosed with schizophrenia, was unable to work, and found herself homeless. She was also having "side effects from psychological medications that were

affecting [her] motor skills to the point where it became excruciatingly hard just to turn over in bed."

There was more.  Called as a government witness, Detective Quinn, testifying about Jorgensen, stated in part:

> Twenty years ago, [Jorgensen] entered a public house, a bar, where people were drinking and identified four males that had bullied him while he was at childhood school and continued to bully him into young . . . adulthood.  And Mr. Jorgensen was armed with a shotgun.  He walked into the public house and discharged the shotgun at the people who had bullied him, fortunately, missing all of them.  He then ran out of the public house, placed a shotgun into his mouth, and discharged it.  Fortunately, the cartridge of the firearm left the right cheek of his face and didn't go up into the brain.  He required extensive facial surgery . . . .

In addition, Detective Quinn told the jury about several of Jorgensen's botched suicide attempts.  These included sitting in a tree with a noose, willing himself to jump, and swimming out to sea, waiting for "tiredness" to get "the better of him."

So, too, Collins testified that her minor granddaughter lived with the granddaughter's father after her mother's death.  That arrangement, though, "didn't work out."  She then moved in with her maternal grandparents but "grandma died."  She was sent "to a girls' home and ended up with" Collins, who soon discovered that her granddaughter, then a young teenager, "ha[d] posted a

picture of herself with a scarf around her neck like she was hanging herself."

   This barrage of emotionally laden testimony was merely the tip of the iceberg.  Through the medium of Exhibit 16, the government displayed to the jury a mountain of emails to and from the defendant pertaining to cyanide-related transactions.  Some authors wrote paragraphs explaining how their lives had fallen apart.  Others emailed repeatedly, begging the defendant to respond.  Taken collectively, these lachrymose emails were likely to evoke an emotional response in even the most hardened individuals.  Once again, a few examples suffice to make the point:

- "[I] have been suffering an infection since birth . . . [I] don['']t want to continue my life . . . [I] need some potassium cyanide . . . tell me the price."

- "I need enough C to make me go fast and painlessly . . . I keep trying to kill myself but won't die. . . . How much will I need how long will it take to make me sleep forever."

- "I am ready to die and this seemed like the best method."

- "[H]ow much can [I] get it for [I'm] sick of this shit world."

- "I don't know what to expect from this email but the darkness has overtaken me and my friend."

- "Rumour has it you can hook me up with sweet release.  How much, how quickly?"

This evidence permeated the record:  it was as copious as it was emotionally charged.  And it had virtually no probative value.

In an effort to dredge up some semblance of probative value, the government notes that it had the burden to prove the existence of the fraudulent scheme.  That is true as far as it goes — but it does not take the government very far.  The existence and dimensions of the scheme were amply demonstrated by proof of the defendant's advertisement, the number of victims, their initial contacts, and the defendant's responses.  Although the anecdotal background evidence may have had a scintilla of probative value with respect to the existence of the fraudulent scheme, it was wholly cumulative and, thus, gratuitous.  See Fed. R. Evid. 403; Sabean, 885 F.3d at 40.

The short of it is that the extensive evidence as to the circumstances of the defendant's customers and the thought processes that led them to the brink of suicide added virtually nothing of legitimate value to the government's case.  This evidence was not needed to prove the existence of the scheme, nor did it assist the government in proving, say, the defendant's

identity or motive. Just because evidence may have a smidgen of probative value, that bare fact does not give the government free rein to capitalize upon its emotionally laden content, particularly where, as here, the government can easily prove its case without fanning the flames of unfair prejudice.

The prosecution — which has available to it the immense resources of the federal government — possesses a significant advantage in criminal cases, and there seldom is a good reason for a prosecutor to push the envelope of that advantage. Mindful of this imbalance, we consistently have "warn[ed] the government" about "the folly of . . . overkill." United States v. Frankhauser, 80 F.3d 641, 650 (1st Cir. 1996) (quoting United States v. Arias-Montoya, 967 F.2d 708, 714 (1st Cir. 1992)). We echo this warning today.

For these reasons, we hold that the anecdotal background evidence unfairly prejudiced the defendant because it dwelled upon the desperation of severely depressed individuals in what amounted to a blatant attempt to engage and inflame the jurors' passions. In our view, such unfair prejudice substantially outweighed whatever scant probative value the anecdotal background evidence may have had. We are left with a definite and firm conviction that the district court committed a manifest error of judgment in working the Rule 403 calculus. As a result, admitting the anecdotal background evidence was an abuse of discretion.

The government has a fallback position. It says that even if the district court abused its discretion in admitting the anecdotal background evidence, the error was harmless. The question reduces to whether admission of this evidence "results in actual prejudice because it had a substantial and injurious effect or influence in determining the jury's verdict." Ruiz-Troche, 161 F.3d at 87 (quoting United States v. Shay, 57 F.3d 126, 134 (1st Cir. 1995)).

"An error will be treated as harmless only if it is 'highly probable' that the error did not contribute to the verdict." Fulmer, 108 F.3d at 1498 (quoting United States v. Melvin, 27 F.3d 703, 708 (1st Cir. 1994)). "To sustain the verdict, the reviewing court must be able to say with a fair degree of assurance that the erroneous ruling did not substantially sway the jury." Ruiz-Troche, 161 F.3d at 87.

> [A] harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue.

United States v. Piper, 298 F.3d 47, 57 (1st Cir. 2002) (quoting United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993)). For criminal cases, the strength or weakness of the government's

evidence of guilt is normally the most important integer in the harmlessness equation. Practically speaking, a reviewing court may find an error harmless when the properly admitted evidence, in and of itself, furnished overwhelming proof of the defendant's guilt. See Ford, 839 F.3d at 110; see United States v. Eads, 729 F.3d 769, 778 (7th Cir. 2013); Clark v. Moran, 942 F.2d 24, 27 (1st Cir. 1991). Here, we hold that the error in admitting the anecdotal background evidence was harmless as to counts 1, 5, 7, and 12 but not as to count 14.

At the outset of the trial but before the jury was in the courtroom, defense counsel acknowledged that the government would not "hear much" from him as to counts 5, 7, and 12 (the Denton fraud counts). He explained that the defendant already had pleaded guilty to the non-Denton fraud counts and, thus, had admitted the existence of the fraudulent scheme. Consistent with these statements, the defense focused at trial primarily on attacking the elements of counts 1 and 14 rather than attempting to present a full-throated defense to the fraud counts. And during his summation, defense counsel stated outright that Denton was a victim of the fraudulent scheme and that counsel could "not deny that the [g]overnment" proved that scheme.

These admissions did not come out of the blue. During the trial, the government presented copious — and uncontradicted — evidence of the scheme. In addition, the government introduced

documentary evidence of Denton's payment to the defendant, their email correspondence, tracking information for the first package the defendant sent to Denton, and Denton's IC3 complaint (which pointed out that the first package did not contain cyanide).

On whole-record review, we are confident that the guilty verdicts on the fraud counts were mandated by the properly admitted evidence. This evidence, standing alone, supplied overwhelming proof of the defendant's guilt. Thus, even though the error in admitting the anecdotal background evidence was egregious, we do not think that the jury verdicts on the fraud counts were tainted by that evidence.

We reach the same conclusion as to count 1 (mailing injurious articles resulting in death). With respect to this charge, the evidence of guilt was very strong. After the constructive amendment, see supra Part II(A)(1), the government had to prove that the defendant "knowingly deposit[ed] for mailing . . . anything declared nonmailable . . . with intent to kill or injure another . . . [and that such mailing] resulted in the death of any person." 18 U.S.C. § 1716(j). The government made that showing — and it did so without reference to the improperly admitted evidence. Although the defendant made a feeble effort to suggest that he was not the source of the cyanide that killed Denton, the government presented plentiful evidence, properly admitted, confirming the existence of each element required by the

statute of conviction. For instance, there were postal records tracking the defendant's second shipment to Denton; the envelope discovered near Denton's body contained cyanide residue and identified the defendant as its sender; records detailing the defendant's receipt of cyanide from California and his payment for it were admitted into evidence; and the jury reviewed emails between Denton and the defendant discussing the former's desire to end his life and the latter's willingness to send cyanide to assist. There was, moreover, ample proof that the defendant's actions resulted in Denton's death. See supra Part II(A)(2). Given the strength of the government's case on count 1, we have a high degree of assurance that the anecdotal background evidence, though improperly admitted, did not tarnish the verdict. It follows that as to count 1, the error was harmless. See Ford, 839 F.3d at 108; Piper, 298 F.3d at 58.

This leaves count 14 (the witness tampering count). That count required proof of the defendant's intent to "prevent the communication by [Denton] to a law enforcement officer . . . of information relating to the commission . . . of a Federal offense." 18 U.S.C. § 1512(a)(1)(C). Intent is inherently difficult to demonstrate, see United States v. Whiffen, 121 F.3d 18, 21 (1st Cir. 1997), and in this instance we discern no overwhelming evidence of the culpable intent required by the statute of conviction.

To be sure, there was some circumstantial evidence of this intent. For instance, there was evidence that Denton had complained to IC3, that the defendant knew about this complaint when he shipped the cyanide, and that the defendant was concerned about the FBI's awareness of his "goings on." But the defendant might have sent the cyanide, the second time around, for any number of reasons apart from trying to prevent Denton from communicating with law enforcement. As his counsel implied at trial, the defendant simply may have wanted to assist Denton's suicide. Given the inherent difficulty of proving the necessary intent and the peculiarities of this case, we cannot conclude with the requisite degree of assurance that the anecdotal background evidence did not influence the verdict on count 14.

This conclusion is fortified by the other considerations revealed through a panoramic inquiry into the relevant circumstances. It strains credulity to imagine that the poignant nature of the anecdotal background evidence was somehow overshadowed by properly admitted evidence of the defendant's guilt on count 14, especially since the properly admitted evidence on this count lacked emotional valence. Common sense and human experience suggest that raw testimony about severe depression, failed suicide attempts, and the like would substantially sway a jury, whereas drier documentary evidence such as UPS records and purchase invoices would have considerably less impact.

The government's actual use of the anecdotal background evidence is telling.  In his opening statement, the prosecutor alluded to the anecdotal background evidence — mentioning Cottle's difficulties at work as well as Williams's divorce, car accident, and dead dog.  A full quarter of the government's witnesses (seven out of twenty-eight) provided anecdotal background evidence.  Last but not least, the prosecutor's summation made abundant use of the anecdotal background evidence, first recounting contents from some of the Exhibit 16 emails and then discussing in detail how the defendant "toyed" with Roland.

When a panoramic inquiry into the relevant circumstances has been carried out, we are left without fair assurance that the erroneous admission of the anecdotal background evidence did not materially influence the jury's verdict on count 14.  The anecdotal background evidence was central to the government's presentation of its count 14 case; it was unique; its emotional content was highly charged and its potential for prejudice was correspondingly great; and the government made powerful use of it at critical stages of the trial.  These factors tilt the balance of the harmlessness equation against the government as to this count.

In an attempt to snatch victory from the jaws of defeat, the government makes two additional arguments.  First, it submits that the acquittal on count 15 (witness retaliation) is a telltale clue that the jury dispassionately considered the proof as to count

14, notwithstanding the force of the anecdotal background evidence. We do not agree. Simply because a jury acts rationally in acquitting on one charge while convicting on others does not relegate improperly admitted evidence to the scrap heap of harmless error. See United States v. Litvak, 889 F.3d 56, 71-72 (2d Cir. 2018). This is such a case: the strongly provocative nature of the anecdotal background evidence, improvidently admitted, created too high a likelihood that such evidence influenced the jury's consideration of count 14.

Second, the government suggests that because the district court instructed the jury on several occasions that the use of certain exhibits, including Exhibit 16, must be restricted to purposes delineated in Rule 404(b) (motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident), the admission of the anecdotal background evidence was harmless. The flaws in this suggestion are at least twofold. First, the court did not give this instruction relative to any anecdotal background evidence, save for Exhibit 16. Second — and more fundamentally — the limiting instruction did nothing to insulate the jurors from the emotional clout of the challenged evidence.

That ends this aspect of the matter. We find the error in admitting the anecdotal background evidence harmless as to most counts. Count 14, though, requires a different calculus. As to

that count, the error was not harmless, and the verdict cannot stand.

## D. **Sentencing.**

This brings us to the defendant's claim of sentencing error. The defendant attempts to argue that the court erred in calculating his base offense level with respect to count 1 by analogizing that conviction to first degree murder. We deem this argument waived: the appellant's brief mentions it only in a cursory manner, without citation to any relevant authority. See Zannino, 895 F.2d at 17.

The defendant also contends that the concurrent twenty-year sentences on the wire and mail fraud counts (counts 2 through 13) are unconstitutional. Because this claim relates only to sentences imposed on the fraud counts, it is unaffected by our vacation of the jury verdict on count 14.

The defendant's claim rests on the Eighth Amendment's proscription against "cruel and unusual punishments." U.S. Const. amend. VIII. As relevant here, this proscription applies to criminal sentences that are "grossly disproportionate" to the underlying offenses. Solem v. Helm, 463 U.S. 277, 288 (1983). When — as in this case — capital punishment is not implicated, "the Eighth Amendment 'does not require a precise calibration of crime and punishment.'" United States v. Rivera-Ruperto, 852 F.3d 1, 17 (1st Cir. 2017) (quoting United States v. Graciani, 61 F.3d

70, 76 (1st Cir. 1995)), cert. denied, 139 S. Ct. 1258 (2019). Given this latitude, it is not surprising that, in non-capital cases, "successful challenges to the proportionality of particular sentences have been exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980); see United States v. Polk, 546 F.3d 74, 76 (1st Cir. 2008) (describing such cases as "hen's-teeth rare").

Here, the defendant complains that his concurrent twenty-year sentences on the wire and mail fraud counts were grossly disproportionate to the offenses of conviction. Because the defendant proffers this plaint for the first time on appeal, our review is for plain error. See United States v. Blodgett, 872 F.3d 66, 71 (1st Cir. 2017); Duarte, 246 F.3d at 60.

As a general rule, defining federal crimes and establishing appropriate penalties are matters within Congress's exclusive domain. See Polk, 546 F.3d at 76-77. Congress has made the reasoned judgment that a fraud offense can, under certain circumstances, be so blameworthy as to warrant a twenty-year term of immurement. See 18 U.S.C. §§ 1341, 1343. Courts owe substantial deference to such legislative judgments; they cannot sit as "'superlegislature[s]' to second-guess" congressional wisdom. Ewing v. California, 538 U.S. 11, 28 (2003) (plurality opinion); see Rivera-Ruperto, 852 F.3d at 17-18.

In this instance, the challenged sentences were within — though at the apex of — the penalties that Congress established

- 48 -

for the offenses of conviction.  Those offenses included seven wire fraud counts and five mail fraud counts.  At sentencing, the district court explained that the defendant's crimes were much "more egregious than . . . common fraud."  After all, the defendant sought out and preyed upon vulnerable, suicidal victims, offering to sell them cyanide but instead sending them Epsom salts.  The court appropriately identified the defendant's chosen targets, his use of the internet to enlarge the reach of his criminal activities, and the protracted duration of the scheme (roughly thirteen months).  Moreover, the court acknowledged that the defendant had gone from bad to worse and had taken drastic measures to conceal his fraud by sending real cyanide to the one victim whom he knew had dared to blow the whistle and report the defendant's chicanery to federal authorities.  Against this backdrop, the sentencing judge — an experienced hand — concluded that the offenses of conviction were "among the most heinous" that he had ever seen.  This depravity was all the more opprobrious because the defendant operated in an "appalling moral vacuum." Given the sentencing court's supportable findings, we think that the twenty-year sentences, though severe, scarcely can be seen as grossly disproportionate to the defendant's conduct.

The defendant demurs.  In his repast, he trivializes the scope of his cruel and cynical scheme by pointing to his relatively few victims (nine) and the relatively meager revenues ($2,732.55)

garnered through his scheme.  Similarly, he tries to minimize the gravity of his conduct by noting that "there is no evidence" that any of the victims besides Denton actually "attempted suicide with the Epsom salts."  Finally, he argues that the guideline sentencing range for fraud offenses suggests sentences much more modest than the sentences that he received.

These arguments lack force.  They ignore not only the fragility of the defendant's victims but also the broad scope and breathtaking cruelty of the defendant's scheme.  By the same token, they ignore the sordid fact that no fewer than 274 desperate individuals, all of whom were contemplating suicide, reached out to the defendant in response to his ads.  Considering all of the relevant circumstances, there is no principled way for us to say that the sentences imposed were grossly disproportionate to the conduct surrounding the offenses of conviction.

The sentencing guidelines do not lead us to a different conclusion.  Although the guideline sentencing range for a garden-variety fraud case is well below twenty years, the guidelines are designed for cases that fall within the "heartland" of a given offense.  Kimbrough v. United States, 552 U.S. 85, 109 (2007) (quoting Rita v. United States, 551 U.S. 338, 351 (2007)).  The case at hand is well outside the heartland of fraud offenses:  the defendant's conduct and his subsequent coverup were far more egregious than that entailed in a run-of-the-mill fraudulent

scheme. The guidelines account for atypical cases through departures and variances, see Rita, 551 U.S. at 344, and thus, the guideline sentencing range for a particular offense bears very little relation to the question of whether a particular sentence in an out-of-the-ordinary case violates the Eighth Amendment, see, e.g., United States v. Bowers, 811 F.3d 412, 432-33 (11th Cir. 2016) (holding sentence that exceeded top of guideline range by more than 150 years not grossly disproportionate).

If more were needed — and we doubt that it is — the Supreme Court has repeatedly upheld lengthy sentences against Eighth Amendment challenges for offenses less grievous than the offenses of conviction. See, e.g., Ewing, 538 U.S. at 28-31 (affirming lengthy sentence based on recidivist statute for theft conviction); Harmelin v. Michigan, 501 U.S. 957, 961, 996 (1991) (affirming sentence of life imprisonment for possession of cocaine); Rummel, 445 U.S. at 265-66, 284-85 (upholding life sentence under recidivist statute when triggering offenses involved small amounts of money). So, too, the courts of appeals have rejected Eighth Amendment challenges to lengthy sentences in fraud cases which, like this one, are embedded in an array of aggravating circumstances. See, e.g., United States v. Neba, 901 F.3d 260, 264-65 (5th Cir. 2018) (affirming seventy-five-year sentence for healthcare fraud), cert. denied, 139 S. Ct. 1322 (2019); United States v. Hebert, 813 F.3d 551, 565-66 (5th Cir.

2015) (affirming ninety-two-year sentence for bank fraud and related offenses); United States v. Tolliver, 730 F.3d 1216, 1231-32 (10th Cir. 2013) (affirming consecutive ten- and twenty-year sentences for two counts of using fire to commit mail fraud).

To say more would be to paint the lily. We hold, without serious question, that the concurrent twenty-year sentences on counts 2 through 13 are not grossly disproportionate to the offenses of conviction. Thus, they do not offend the Eighth Amendment. Plain error is plainly absent.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the sentences imposed on counts 1 through 13 are affirmed. The judgment on count 14 is vacated and that count is remanded for further proceedings consistent with this opinion.

**Affirmed in part, vacated in part, and remanded.**