# United States Court of Appeals
## For the First Circuit

No. 13-1156

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN COLON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

Theodore M. Lothstein, with whom Lothstein Guerriero, PLLC, was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

February 26, 2014

**KAYATTA, Circuit Judge**. Juan Colon was convicted, after a three-day jury trial in the United States District Court for the District of Rhode Island, of possession of marijuana with intent to distribute, possession of a firearm by a convicted felon, and possession of a firearm with an obliterated serial number. A significant part of the government's case consisted of incriminating statements he made to the police over the course of several encounters. In turn, a significant part of Colon's defense was to argue that the statements should not be believed for a variety of reasons, including lack of voluntariness. A federal statute, 18 U.S.C. § 3501(a), provides that in cases such as this, the trial court, after having satisfied itself that a confession was given voluntarily, "shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." Colon now appeals, arguing that the trial court committed plain error by failing in its jury instructions to hew closely enough to the statute's text. Finding no reversible error, we affirm.

## I. Facts

The facts giving rise to this appeal are undisputed. On December 2, 2011, police in Providence, Rhode Island sought and obtained a "no-knock" search warrant entitling them to search the first floor apartment of the building at 28 Homer Street in Providence. The police obtained the warrant based on information

-2-

they had collected during a month-long investigation focusing on the apartment and one of its inhabitants, Juan Colon, who lived there with his girlfriend, Rosaris Cabreja, and their two-year-old daughter. The warrant authorized officers to search both the first floor apartment and Colon himself for narcotics and firearms.

At approximately 7:30 p.m. on December 5, 2011, and aware that Colon was in the apartment, police battered down the front door and entered. According to the trial testimony of Detective John Black, the first officer to enter the apartment, Colon was armed. Upon the officers' entry, Colon rose from a seat in the apartment's living room, ran through a hallway to a bedroom in the back of the apartment, and threw the firearm he had been holding behind a nightstand.[1] At that point, officers took Colon to the ground, handcuffed him, presented him with the search warrant, explained why they were at the residence, and read him his rights.

According to Detective Black, Colon then told Black that he was a marijuana dealer and that any narcotics and firearms in the apartment belonged to him, not to Cabreja. He showed Black thirteen bags of marijuana, individually wrapped, and denied having other drugs in the apartment. Perhaps skeptical, officers continued to search the apartment while Colon, who was secured in a room separate from Cabreja and their daughter, repeatedly yelled

---

[1] Upon later inspection, this firearm turned out to be a Ruger SR9 model handgun with a scratched-off serial number and a magazine containing seventeen live rounds.

apologies to Cabreja in both English and Spanish. Eventually, officers took Colon to the police station, leaving Cabreja and the child behind.

After Colon had been removed from the apartment, police found 3.55 grams of cocaine, stored with zip lock bags, in a baby wipes container in a kitchen cabinet that also contained a digital scale with cocaine residue on it. Elsewhere in the apartment, police found a small pill bottle containing marijuana, a backpack containing ammunition in various calibers, and two rolls of cash, totaling $9,900, in the pocket of a pair of blue jeans that also contained Colon's identification.

According to Black's testimony, after they found the cocaine, officers told Cabreja that they had found a firearm in the residence, that they knew that Colon was dealing marijuana and cocaine out of the residence, and that Colon had given them consent to search two vehicles registered to Cabreja. Having so informed her, they additionally sought and obtained her consent to search the vehicles.[2] After Cabreja signed written consent forms for both vehicles and produced keys for one, police searched both vehicles, finding in one of them a .25 caliber handgun, $10,000 in cash, and paperwork bearing Colon's name, and finding in the other a .45 caliber handgun containing eight live rounds.

---

[2] Though Colon argued below that neither he nor Cabreja gave consent to search the cars, he has declined to appeal the district court's finding that in fact, both of them did so.

-4-

Following these discoveries, police placed Cabreja under arrest for possession of firearms and narcotics and took her back to the station, where Black questioned her in an interview room. At the close of that questioning, Black went to a different interview room, where he questioned Colon, who had been waiting for approximately ninety minutes in a cell block before being transported to an interview room and handcuffed to a wall. According to the recording of that questioning,[3] Black first read Colon his Miranda rights, which Colon again waived.[4] Black then proceeded to briefly ask about Colon's daughter and about Colon's relationship with Cabreja. Upon determining that Colon's daughter was two years old, that Cabreja was the daughter's mother, and that Colon and Cabreja had been dating for approximately five years, Black began his inquiry into the offenses as follows:

> [Detective Black:] Alright, listen, here's the deal. You've got some problems right now. You got some issues. The gun you had on you tonight it's got a scratched off serial number. That's not good. It's not good it's got

---

[3] A recording of the interview was played at trial, and the jury was provided with both the recording and a transcript thereof.

[4] In his motion to suppress his self-inculpatory statements, Colon, a native Spanish speaker, argued that his waivers were neither knowing nor voluntary, because they came before he had been given a Spanish-language Miranda warning. In denying the motion, the district court, noting that Colon was a previously convicted felon, "put no credit in the argument that he didn't really understand what was going on because of the language barrier." The district court concluded that the circumstances surrounding the confessions did not "create[] anything close to a highly coercive environment," and that the waivers were both knowing and voluntary. That determination is not challenged on appeal.

a laser [sight]. And it's not good that you're in possession with intent to deliver cocaine and marijuana while you're in possession of a firearm. That's not good. Okay? I'm going to ask you--I'm going to talk to you about a couple of things. And what I need to determine from you is who to charge. I mean you're getting charged. You[r] cooperation will go a long way like I told you earlier on, you know, how much time you do ultimately and how much a judge finds you to be, you know, being able to be rehabilitated. Okay? . . . I have your girlfriend here.

Black then proceeded to interrogate Colon, largely by explaining the details of what he had observed during the execution of the warrant and asking Colon to confirm them. During the interrogation, Colon admitted that the marijuana and the Ruger SR9 firearm found in the house belonged to him. He also admitted, contrary to what he had suggested at the apartment, that he had sold cocaine.

Soon after Colon confessed to having sold marijuana and cocaine, the memory on Black's recorder ran out. Black continued the interrogation for a short while before noticing, departing the interview room to clear space on the recorder, and returning. The transcript reveals that soon after Black returned, Colon admitted that the firearms in the cars belonged to him.[5] At the end of the interrogation, Black told Colon that he would "talk to [his] boss and "try to get [Cabreja] home to the baby." After the

_____

[5] Black testified at trial that, during the unrecorded portion, Colon's "tone never varied, never changed." And Colon does not suggest that officers engaged in untoward behavior during the portion of the interview that the recording failed to capture.

-6-

interrogation, the police released Cabreja without charging her and permitted Colon to enter the interview room in which she had been detained in order to say goodbye. The police detained him overnight, and while some prisoners were transported to court for arraignments early the next morning, Colon remained in his cell block at the station.

The following morning, Special Agent Kevin McNamara interrogated Colon in an interview room at the station. McNamara read Colon his <u>Miranda</u> rights, but in what he referred to at trial as an "oversight," failed to have Colon sign a waiver form. McNamara's digital recording of the interrogation was played for the jury and transcribed. During the interrogation, Colon admitted to having purchased two of the firearms and having received the third from an individual who had found it. Colon further admitted to using and selling marijuana.

On April 4, 2012, Colon was indicted on five counts related to the above incidents. Count 1 charged him with possession of cocaine with intent to distribute; Count 2 charged him with possession of marijuana with intent to distribute; Count 3 charged him with possession of a firearm by a convicted felon; Count 4 charged him with possession of a firearm in connection with the drug trafficking crimes alleged in Counts 1 and 2; and Count 5 charged him with possession of a firearm with an obliterated serial number.

Prior to trial, Colon moved to suppress the statements he made to Black and McNamara, arguing that any waiver of his <u>Miranda</u> right to remain silent was a product of threats and coercion. Though that motion was denied, Colon's defense strategy focused largely on convincing the jury that the statements he had made to the two officers could not be believed. Prior to trial, Colon proposed the following jury instruction:

> You have heard evidence that Juan Colon made certain statements in which the government claims he admitted certain facts. Testimony regarding unrecorded statements, particularly in circumstances where recording equipment is available, must be viewed with caution. It is for you to decide (1) whether Mr. Colon made the statements he is alleged to have made, and (2) if so, how much weight to give them. In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the statement may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the alleged statement.

During the opening statement, Colon's lawyer relied on the theme that Colon's inculpatory statements need be viewed in context, telling the jury that when Colon was interviewed at the station, "he didn't know where his daughter was, and the detective who spoke to him told him repeatedly throughout his statement . . . that his girlfriend was going to be charged criminally if he didn't cooperate and talk to the police." She advised the jury as follows: "[A]s you listen to [the recorded interviews] and other similar pieces of evidence in this case, I want you to consider the circumstances under which that evidence is

gathered.  If you do that, you'll see that the facts are not as the Government says."

Later, during her cross-examinations of Black and McNamara, Colon's attorney returned to this point.  In particular, her questioning revealed that both Black and McNamara had become aware through their conversations with Colon that English was not Colon's first language; that they nevertheless did not read him his rights in Spanish; and that Black could not precisely identify what had transpired during the portion of the interview time that the recording had failed to capture.

Finally, during her closing argument, Colon's attorney returned to the theme that the confessions were unreliable.  After pointing out flaws in other pieces of evidence, she argued that the confessions were the result of coercive and threatening circumstances, with a "beaten down" arrestee letting officers put words into Colon's mouth to help his girlfriend.

Before the jury began deliberations, the district court drafted an instruction, which it gave to counsel for their review. In relevant part, it read as follows:

> Now, in evaluating testimonial evidence, you should remember that you're not required to believe something to be a fact simply because a witness has stated it to be a fact and no one has contradicted what that witness had to say.
>
> If in light of all the evidence you believe the witness is mistaken or has testified falsely or is proposing something that is just inherently impossible or unworthy of your belief, then you may disregard that

witness's testimony even in the absence of contradictory evidence.  You should also bear in mind that it's not the number of witnesses testifying on any side of a particular issue that determines where the weight of the evidence lies, rather it's the quality of the witness's testimony that counts.

Now, the fact that a witness may be employed by law enforcement does not by itself mean that you should give that witness's testimony any greater or any lesser weight simply because of that fact.  You should assess the credibility and testimony of such witnesses by applying all the factors, the same factors you would for any other witness.

. . .

In addition to assessing the credibility of witnesses and the weight to be given to their testimony, you should also evaluate the exhibits that you will have with you in the jury room.  So examine them and consider them carefully, however, bear in mind that merely because an exhibit has been admitted into evidence does not mean you are required to accept it at face value.  Just like with the testimony of a witness, the significance of an exhibit or the weight that you attach to it will depend on your evaluation of that exhibit in light of all the facts and all circumstances of the case.

Now, during this trial, you  heard two recorded conversations.  These conversations may be considered by you like any other evidence, and you will have those recordings with you in the jury room on a disk, the exhibit, and there'll be a means of playing them if you wish to play them.

Colon's counsel raised no objection; the trial judge gave the instruction as drafted; and Colon's counsel again voiced no objection.

The jury found Colon not guilty on Count 1 (possession of cocaine with intent to distribute) and Count 4 (possession of a firearm in furtherance of drug trafficking).  It  found him guilty

-10-

on Count 2 (possession of less than fifty kilograms of marijuana with intent to distribute), Count 3 (possession of a firearm after having been convicted of a crime punishable by imprisonment for more than one year), and Count 5 (possession of a firearm with an obliterated serial number).

The district court sentenced Colon to a total of 96 months' incarceration, and Colon timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  Standard of Review

Resting his appeal on a single argument, Colon contends that we should vacate his conviction because the district court failed to instruct the jury, under section 3501(a), to "give such weight to the confession as the jury feels it deserves under the circumstances."  We have long held that in order to preserve a challenge to a jury instruction, a litigant must object when the instruction is not given in the manner the litigant desires. See, e.g., United States v. Combs, 555 F.3d 60, 63 (1st Cir. 2009). Because Colon concedes that he did not so object, we review only for plain error, see United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009), a standard that requires an appellant to meet the "heavy burden" of showing "(1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial

proceedings." United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008). "[W]hile reversal of a conviction predicated on unpreserved jury error is theoretically possible, it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Gonzalez, 570 F.3d at 21 (alteration and internal quotation marks omitted).

### III. Analysis

It is not at all clear that any error occurred here. We customarily review jury instructions for their substance, considered as a whole, rather than for any particular magic words. E.g., Jones v. United States, 527 U.S. 373, 391 (1999) ("Our decisions repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge."); United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009). Viewed as a whole, the jury instructions here fairly--indeed plainly--told the jury that it could decide for itself the weight and significance to be given any testimony or exhibits, specifically including the recorded statements given by Colon at the police station. The trial court further made clear that the significance and weight of such testimony and exhibits should depend on the jury's evaluation of all the facts and circumstances.

Colon nevertheless argues that the instructions fell short because they were not "consistent with § 3501." Colon argues

-12-

that the instructions as given varied subtly but substantively from the required instruction because the trial court did not tell the jury that it could give the confession such weight as it "_feels_ it deserves."  18 U.S.C. § 3501(a) (emphasis added).  Reading much into these three words, Colon's counsel suggested at oral argument that the statutory language, unlike the actual instructions given, encourages the jury to act on its subjective feelings about "what is the right thing to do with this confession.  Not just 'is it true' but what is the right thing to do with it.  And if the police coerce it, the right thing to do with it is to toss it, and not consider it."

The distinctions Colon tries to draw between the charge as given and the language of section 3501 are both unconvincing and immaterial.  Nothing in the statute's language or legislative history suggests that Congress intended, by the statute's passage, to abrogate by intimation the general notion that "the district court has considerable discretion in how it formulates, structures, and words its jury instructions."  See Gonzalez, 570 F.3d at 21 (quoting United States v. Prigmore, 243 F.3d 1, 17 (1st Cir. 2001)) (internal quotation marks omitted); see also United States v. Adams, 484 F.2d 357, 362 & nn.3-5 (7th Cir. 1973) (no error to instruct that "it is for the jury to determine the credibility and weight to be given such statement with respect to defendant's innocence or guilt"); United States v. Williams, 484 F.2d 176, 178

(8th Cir. 1973) (per curiam) ("[Section 3501(a)] does not specify any particular wording for an instruction on the weight to be accorded a confession . . . ."). More specifically, we reject the notion that Congress intended to convey in the word "feels" any sense that jurors should do something different than evaluate and assign weight to the evidence based on the facts and circumstances. The section 3501(a) instruction came about, after all, as part of an effort to overrule the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436 (1966). See Dickerson v. United States, 530 U.S. 428, 436-37 (2000). When the Supreme Court in Dickerson knocked down the body of that effort, the instruction remained, like Ozymandias's pedestal, serving little continuing purpose beyond reminding one of the impermanence of that which it once supported. We cannot imagine that the Congress that drafted the original, anti-Miranda statute intended to extend an invitation to juries to disregard voluntary, credible confessions.

In any event, we need not decide in this case whether the section 3501 instruction must be given as written if counsel so insists. Here, as explained above, counsel did not so insist, and we thus review only for plain error. And on plain error review, any distinctions in textual connotations between the language of section 3501 and the language of the instruction as given are too fine to do the work needed, because they fail to provide a basis for finding that the outcome of the case would likely have changed

-14-

had the precise language of section 3501 been read.  See, e.g., United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997) ("[U]nder United States v. Olano, 507 U.S. 725, 734, 741 (1993), an error that occurred without objection at trial--however flagrant--does not warrant reversal unless it likely affected the outcome.").  The instruction as given clearly told the jury that the weight to be given to the confessions was up to the jurors in light of all the facts and circumstances of the case.  The broad leeway thus given provided no cudgel to rebut in deliberations any juror who might have expressed a "feeling" that the evidence "deserved" no weight.  Counsel argued without restraint against reliance on the confessions, and the government claimed no ally in the language of the given instructions to counter such arguments.

We note as well that the jury did not convict Colon of all the offenses to which he confessed during his interrogations at the station.  Rather, it convicted him only of the offenses to which he promptly confessed at the scene of the arrest, after receiving Miranda warnings but before being exposed to most of the tactics that Colon suggested at trial were coercive.  And each of those confessions was buttressed by physical evidence and unburdened by the interrogative tactics of which counsel complained.  In short, no one can realistically argue that this jury did not realize that it could decide how much weight the confessions deserved.  See, e.g., United States v. Walker, 665 F.3d

-15-

212, 231-32 (1st Cir. 2011) (noting that harmless error analysis "takes into account, among other things . . . any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue" (internal quotation marks omitted)).

### III.  Conclusion

We see no meaningful difference between the instruction called for by section 3501 and the instruction given at Colon's trial.  Moreover, even were we to assume that a court should more closely hew to the language of section 3501, any error to that effect went unchallenged and is unlikely to have affected the outcome of Colon's trial.  We therefore <u>affirm</u> the district court's judgment.

<u>So ordered</u>.