# United States Court of Appeals
## For the First Circuit

No. 21-1545

UNITED STATES,

Appellee,

v.

RICARDO A. VILLA-GUILLEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Rikelman, Hamilton,[*] and Thompson,
Circuit Judges.

Rachel Brill for appellant.

David C. Bornstein, Assistant United States Attorney, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 17, 2024

---

[*] Of the Seventh Circuit, sitting by designation.

**RIKELMAN, Circuit Judge**. After a short trial consisting of almost no physical evidence, a jury convicted Ricardo Villa-Guillen ("Villa") of conspiring to traffic cocaine from Puerto Rico to the continental United States, in violation of 18 U.S.C. §§ 841(a)(1) and 846. On appeal, Villa alleges an array of errors in the district court proceedings. We agree with Villa that two of the district court's evidentiary rulings led to prejudicial error. Those rulings involved types of evidence that are likely to lead a jury astray -- the admission of a letter discussing Villa's potential interest in a plea deal, which the government claimed was tantamount to a confession, and the admission of testimony suggesting that Villa was more likely to have committed this crime because he had supposedly participated in a different drug transaction (for which he was never charged). We therefore reverse and order a new trial.

## I.    BACKGROUND

### A.    Relevant Facts

"Because we review the challenged evidentiary rulings using a balanced approach, 'objectively viewing the evidence of record,' we present the background facts in a similarly balanced manner." United States v. Irizarry-Sisco, 87 F.4th 38, 41-42 (1st Cir. 2023) (quoting United States v. Velazquez-Fontanez, 6 F.4th 205, 212 (1st Cir. 2021)); accord Lech v. von Goeler, 92 F.4th 56, 61 (1st Cir. 2024) (citation omitted). In recounting the facts,

we draw from the testimony of the government's witnesses. See Irizarry-Sisco, 87 F.4th at 42.

Villa began working as a cocaine courier or "mule" around 2005, after learning that his childhood friend, José Herrera-Olavarría ("Herrera"), was part of a trafficking organization run by Humberto Concepción-Andrades ("Concepción"). Concepción transported narcotics from Puerto Rico to New York, relying on corrupt Transportation Security Agency and airline employees who helped his couriers circumvent security screenings to check suitcases containing cocaine onto commercial flights to New York City.[1] The couriers then boarded the same flights, retrieved the suitcases at baggage claim upon arrival, and transported the suitcases to designated hotels in the New York area. Once at the hotels, couriers received instructions to transfer the cocaine to distributors; couriers also would collect money from prior sales, and one trial witness suggested that sometimes couriers would travel to New York only to collect money, not to deliver drugs. According to Herrera, between 2005 and 2007, Villa acted as a courier in Concepción's operation seven or eight times, five or six of which were in Herrera's presence.

---

[1] On a trafficking day, Concepción would provide suitcases filled with cocaine and tagged with U.S. Department of Agriculture inspection stickers to the couriers near the airport.

Around 2009, the start date of the conspiracy charged in this case, Herrera took on a greater role in Concepción's operation and began organizing cocaine shipments on Delta flights. Herrera claimed that Villa was a courier on three of his shipments between 2009 and 2013. After arriving in New York, Villa would travel to the destination hotel by taxi, usually driven by Harold Domínguez.[2]

By the time Villa completed those trips, he had served as a courier about ten times, and the organization's leadership required Villa to change roles out of concern he might otherwise be recognized. Accordingly, Villa became a "watcher," recommending new couriers to the organization and keeping an eye on them during their trips to New York. Herrera recounted that Villa served as a watcher on two trips. In addition, Herrera claimed, Villa invested his own money in five shipments, purchasing one or two kilograms of cocaine in Puerto Rico and paying haulage fees of $2,000 per kilogram for Herrera's couriers to transport the cocaine to New York; Villa would then keep the profit on those sales.

---

[2] Domínguez began transporting Herrera's couriers around New York in 2010. He received $400 for each trip.

## B.   Legal Proceedings

In June 2017, a federal grand jury in the District of Puerto Rico returned a superseding indictment charging Villa, Concepción, Herrera, and five others with conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.[3]   The alleged conspiracy took place from "2009 through December 2013," and "included, but was not limited to," traveling or arranging travel "on commercial flights that departed from the Luis Munoz-Marin International Airport in Carolina, Puerto Rico to the continental United States with kilograms of cocaine concealed inside suitcases."   The indictment also alleged that the conspirators "mailed controlled substances to the continental United States." Villa was arrested in July 2017 and ordered held without bail.

One after another, Villa's co-defendants struck plea agreements, but after unsuccessful negotiations, Villa went to trial.   The government's trial evidence consisted of three days of testimony from five witnesses, including Herrera and Domínguez.[4] The only physical or documentary evidence the government

---

[3] The first indictment had not named either Villa or Concepción as defendants.

[4] Domínguez was not charged in the conspiracy but had entered into a plea agreement and a cooperation agreement in connection with separate federal charges.

- 5 -

introduced were photographs: some identified several of Villa's co-conspirators, one depicted money found during a collateral incident, and several showed suitcases from another courier's cocaine shipment that had been seized at John F. Kennedy (JFK) Airport. Villa did not testify, nor did the defense put on other evidence.

The government's first witness after opening statements was Guillermo Salas, a paid Drug Enforcement Agency (DEA) informant. Salas testified that Villa had tried to purchase eleven kilograms of cocaine from him in a sham drug sale in March 2012 near Miami. After agreeing with Villa to the terms of the sale by phone, Salas met Villa and two other men in the Miami area and instructed Villa to follow him to a nearby warehouse to consummate the transaction. A DEA task force tracked the convoy as it traveled to the site of the ostensible deal, and after seeing Villa make an illegal lane change, DEA agents pulled his vehicle over. While a task-force agent spoke to Villa, a drug-detection dog "alerted" to the passenger side of the vehicle, prompting a search that produced two white plastic bags containing $296,014 wrapped in "quick-count" bundles.[5] The officers did not find cocaine in

---

[5] Guillermo Cuba, a police officer involved in the Florida incident, testified that "quick-count" bundles of cash are commonly used in "money laundering and drug trafficking." The government's Exhibit 14 showed a photograph of the seized money.

the vehicle and did not arrest Villa or his associates, nor was Villa separately charged in connection with the incident. Guillermo Cuba testified after Salas. Cuba, a Miami-Dade police officer assigned to the DEA task force involved in the sting operation, largely corroborated Salas's account of the Florida incident (collectively, "the Florida testimony"). Villa objected to all the Florida testimony, contending that it was irrelevant and unfairly prejudicial. The district court overruled his objections and denied post-trial motions based on those objections.

Domínguez testified next, focusing on Villa's courier activities between 2009 and 2012. Villa sought to cross-examine Domínguez about statements he made to the grand jury that were inconsistent with his trial testimony. But the district court limited the scope of the cross-examination on the ground that it would involve "impeachment by omission."

Next, Dustin Genco, a New York City police officer assigned to a DEA Task Force, testified about the arrest at JFK Airport in August 2010 of a courier named Mapula, who was carrying fifteen kilograms of cocaine. (Herrera later testified that Villa had invested in two of those kilograms of cocaine.) At the time, Mapula was working as a mule to pay off a debt he owed Herrera for losing three kilograms of cocaine while facilitating a previous drug sale in New York. Genco also identified six government

- 7 -

exhibits, which consisted of photographs of the suitcases from which Mapula's cocaine had been seized. He offered no testimony about Villa.

Herrera, the government's final witness, testified across two days of trial. Herrera described the structure and operations of the conspiracy and Villa's roles within it, including that Villa had been a "mule," a "watcher," and an "investor" in ten shipments of twenty to twenty-five kilograms of cocaine each.

At the close of its case, the government asked to read into evidence a redacted version of a letter Villa had written to the court seeking information about a pending motion. In the letter, Villa stated that he "ha[d] expressed . . . [his] desire to reach an agreement with the Government." Villa had continuously objected under Federal Rule of Evidence 403 to the letter's admission, but the district court overruled his objection. After the letter was read to the jury, the court took judicial notice of it and later instructed the jury on the meaning and effect of judicial notice. Following approximately three hours of deliberation, the jury found Villa guilty. The district court sentenced Villa to 300 months' imprisonment and five years' supervised release, and Villa timely appealed.

## II.   STANDARD OF REVIEW

We review preserved objections to a district court's evidentiary rulings for abuse of discretion. United States v.

- 8 -

Monteiro, 871 F.3d 99, 110 (1st Cir. 2017). Although this standard of review affords latitude to the district court's judgment calls, it is "not a 'rubber stamp.'" Colón Cabrera v. Esso Standard Oil Co. (P.R.), 723 F.3d 82, 88 (1st Cir. 2013) (quoting Negrón-Almeda v. Santiago, 528 F.3d 15, 21 (1st Cir. 2008)). Rather, we must carefully examine the record to ascertain whether "a material factor deserving significant weight [was] ignored, . . . an improper factor [was] relied upon, or . . . all proper and no improper factors [were] assessed, but the court [made] a serious mistake in weighing them," including whether the district court made "[a]n error of law." Lech, 92 F.4th at 63-64 (citations omitted). Even so, an "error does not require reversal if it was harmless," meaning "it can be said that the judgment was not substantially swayed by the error." United States v. Burgos-Montes, 786 F.3d 92, 114 (1st Cir. 2015) (citation and internal quotation marks omitted).

### III.  DISCUSSION

#### A.  Villa's Letter to the Court

Right before it began its deliberations, the jury heard about Villa's letter to the district court, which the government described in its closing argument as tantamount to a confession. Villa contends on appeal, as he vigorously insisted before the district court, that the letter was inadmissible under Rule 403 because its minimal probative value was substantially outweighed

by the risk of unfair prejudice. We agree and explain in detail below why we conclude that the error in admitting the letter was not harmless.

To put the letter in context, in 2019, Villa had filed a suppression motion in a separate proceeding before the same federal district court judge. Although a magistrate judge had conducted a hearing on the motion and submitted a written recommendation to the district court, several months had passed without the district court entering an order on the motion. Understandably, Villa was interested in the disposition of the suppression motion, and he personally wrote to the court seeking an update. He explained that he had a "desire to reach an agreement with the Government" and hoped the court would rule promptly because Villa would be "in the best disposition to make a fair, reasonable and intelligent agreement once [he knew] the decision about the Suppression of Evidence." The letter was filed on the dockets of both this case and the other proceeding.

Villa nonetheless maintained his innocence of the charges filed in this case and went to trial. The government sought to introduce the letter shortly after trial began, and the letter's admissibility became an intensely contested topic at sidebar throughout trial. After multiple rounds of argument about the letter's evidentiary value, the district court ultimately decided to let the letter in. The court believed the letter was

"relevant because Villa's assertions convey a consciousness of guilt," and the court thought its admission was fair because Villa sent the "incriminating letter to the Court on his own accord." The court also noted that we had affirmed its ruling admitting what it considered to be a similar letter in a different case, although the earlier case did not involve a Rule 403 objection. See United States v. Bauzó-Santiago, 867 F.3d 13, 21 (1st Cir. 2017).[6]

At the government's suggestion, the court admitted a redacted version of Villa's letter, stripped of references to the suppression motion, the other criminal proceeding, Villa's pretrial detention, and discussions with Villa's attorney. The version that was ultimately read aloud to the jury contained only the bolded language below:

> **Honorable Judge Besosa**
>
> **I extend the most cordial greetings to all the personnel of the courtroom you so well preside.**
>
> **I am writing you this letter** because I am going through a bad time with a lot of frustration **amidst the legal proceedings I am facing.**
>
> I respectfully and heartily request the notification of the decision made regarding

---

[6] The appellant in Bauzó-Santiago had offered "no 403-based argument . . . on appeal," so we lacked occasion to decide whether the letter in that case should have been excluded on the grounds Villa now asks us to consider. 867 F.3d at 21.

- 11 -

the Suppression Hearing held last December 21, 2018 and February 20, 2019.  Case No. 17-608.

**In many occasions, I have expressed** to my legal representation **my desire to reach an agreement with the Government.  I am in the best disposition to make a fair, reasonable and intelligent agreement** once I know the decision about the Suppression of Evidence **to agree and take the best decision regarding the same.  Case No. 16-526.**

**Thank you for your usual[] attention, Cordially,**

**Ricardo Villa Guillen**

**[signature]**

50384-069

MDC Guaynabo[.]

Thus, as redacted, the letter focused on Villa's "desire to reach an agreement with the Government."

The government read the redacted letter into evidence, after which the court took judicial notice of its contents.  The court then explained the meaning and effect of judicial notice by reading the jury instruction it had prepared in accordance with Federal Rule of Evidence 201(f).[7]  The instruction stated:

I believe that the contents of the letter the Defendant sent to the Court, which I read to

---

[7] "In a criminal case," a court taking judicial notice of an adjudicative fact "must instruct the jury that it may or may not accept the noticed fact as conclusive."  Fed. R. Evid. 201(f).

you,[8] can be so accurately and readily determined that it cannot be reasonably disputed. You may, therefore, reasonably treat this fact as proven, even though no other evidence has been presented on this point.

As with any fact, however, the final decision whether or not to accept it is for you to decide. You are not required to agree with me.

The ruling admitting the letter falls among the "rare and 'extraordinarily compelling circumstances'" where we conclude that we must reverse the district court's judgment about the outcome of the balancing test under Rule 403. United States v. Gonyer, 761 F.3d 157, 164 (1st Cir. 2014) (citation omitted). We begin with the letter's minimal probative value. It is of course black-letter law that the threshold for relevance "is low, and it permits the introduction of evidence that 'has any tendency to make a fact more or less probable.'" Ward v. Schaefer, 91 F.4th 538, 544-45 (1st Cir. 2024) (quoting Fed. R. Evid. 401). Yet even against this permissive standard, we struggle to see the relevance of Villa's interest in reaching a plea agreement to the question of whether he was in fact guilty of trafficking narcotics as part of the charged conspiracy.

---

8 The government, not the court, read the letter, but we have reproduced the wording provided to the jury.

To start, we reject the government's contention that Villa's bare interest in a possible plea agreement is relevant to establishing his guilt. "[T]here are a number of reasons why a defendant might choose to plead guilty." Thore v. Howe, 466 F.3d 173, 185 (1st Cir. 2006). Indeed, "a defendant's decision to plead guilty may have any number of other motivations" aside from consciousness of guilt, "including shock, avoidance of financial and emotional cost, and hope for a lesser sentence." Id. (quoting Haring v. Prosise, 462 U.S. 306, 318-19 (1983)). Our precedent has sensibly applied this principle. For example, when a defendant enters a "knowing, intelligent and voluntary" guilty plea that otherwise complies with the requirements of Rule 11 of the Federal Rules of Criminal Procedure, he may still later withdraw that plea if he presents previously unavailable evidence indicating that he "might actually be innocent." United States v. Newbert, 504 F.3d 180, 183, 187 (1st Cir. 2007); see also United States v. Fonseca, 49 F.4th 1, 7 (1st Cir. 2022) (recognizing that defendants may withdraw knowing, voluntary pleas based on a "serious claim of actual innocence" (citation omitted)). In other words, federal law acknowledges that an innocent defendant might nevertheless plead guilty. An initial plea is "not dispositive of [a defendant's] guilt." Newbert, 504 F.3d at 187 n.5.

If an innocent defendant might plead guilty, then the same defendant might logically explore the possibility of striking

a bargain with the government. We can easily conceive of sensible reasons for doing so. For instance, although "[g]uilty defendants generally know that they are guilty, and are aware of the likely evidence against them," innocent defendants might engage in plea discussions because they lack "information about the state's evidence," making it difficult for the innocent to "forecast the likely trial outcome." Stephanos Bibas, Plea Bargaining Outside the Shadow of Trial, 117 Harv. L. Rev. 2463, 2493-94 (2004). Such a defendant, despite his innocence, might prefer the certainty of a plea deal over "the risk of [a] high statutory sentence[]" if he is convicted after a trial. Rachel E. Barkow, Separation of Powers and the Criminal Law, 58 Stan. L. Rev. 989, 1034 (2006); cf. Blackledge v. Allison, 431 U.S. 63, 71 (1977) (recognizing that by pleading guilty, a "defendant avoids . . . the anxieties and uncertainties of a trial"). Thus, we agree that "the fact that [a defendant] sought to engage in plea negotiations . . . is no more indicative of guilt than [of] a desire to pre-empt prosecution or to limit his exposure to a lengthy sentence." United States v. Gotti, 457 F. Supp. 2d 395, 402 (S.D.N.Y. 2006). Absent "any detailed admission of criminal conduct," the "vague" interest in a possible plea deal reflected in Villa's letter is at best marginally probative of Villa's guilt as to the charged conspiracy. Id.

Even if the letter had some probative value, however, Rule 403 contemplates that evidence may still be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." United States v. García-Sierra, 994 F.3d 17, 32 (1st Cir. 2021) (quoting Fed. R. Evid. 403). Because "by design, all evidence is meant to be prejudicial," a district court's rulings under Rule 403 must avoid "only 'unfair' prejudice." United States v. Morales-Aldahondo, 524 F.3d 115, 119-20 (1st Cir. 2008) (quoting United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000)). Still, even "concededly relevant evidence" should be excluded if it would otherwise "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." García-Sierra, 994 F.3d at 33 (quoting United States v. DiRosa, 761 F.3d 144, 153 (1st Cir. 2014)); see also Old Chief v. United States, 519 U.S. 172, 180 (1997) (same).

Here, the prejudice side of the Rule 403 scale weighed decisively against admission, particularly given the government's framing of the letter as a confession. The unduly prejudicial effect begins with the letter's contents. In redacted form, the letter read: "I am writing you this letter . . . amidst the legal proceedings I am facing. . . . In [sic] many occasions, I have expressed . . . my desire to reach an agreement with the Government." Thus, the redacted letter excluded Villa's opening

- 16 -

request for an update on the suppression motion and necessarily skewed the jury's perception of Villa's purpose in sending the letter in the first place.

To make things worse, by obscuring many other details in the letter, the redactions further highlighted Villa's potential interest in a plea. These redactions are the polar opposite of the redactions we approved in the letter at issue in Bauzó-Santiago. There, a defendant had penned a letter to the court explicitly indicating that he "accepted [his] responsibility as to guilt," and the letter was "redacted to remove any reference to plea bargaining" before it was presented to the jury. 867 F.3d at 17 (emphasis added). As we explained, the jury could then infer guilt "from [the defendant's] admission to the charged crime," not "simply from his interest in pleading guilty." Id. at 21 n.4. The redactions here accomplished the reverse: They encouraged the jury to infer guilt from Villa's interest in a plea agreement. And nowhere in Villa's letter -- redacted or not -- was there the type of explicit acceptance of guilt or admission to the charged crime that was crucial to our analysis in Bauzó-Santiago. Cf. id. at 16, 21-22.

The government offers two responses. First, the government contends that Villa never objected to the redactions. We disagree. Throughout the proceedings, Villa objected to the introduction of the letter in any form (with or without the

redactions). Second, the government argues that the redactions were made in an effort to respond to Villa's concern that the unredacted letter was unduly prejudicial because of its references to another case, Case 17-608. But as Villa points out, that simply suggests that even an unredacted version of the letter should have been excluded under Rule 403.

Additionally, the "prejudice and confusion was not mitigated by the instructions provided to the jury." García-Sierra, 994 F.3d at 32. To the contrary, the district court's instruction on judicial notice compounded the unfairness to Villa. As a reminder, after the government read the redacted letter to the jury, the district court took judicial notice of it (at the government's request). The court then explained to the jury how it should understand the taking of judicial notice by reading the instruction it planned to give, which stated, in relevant part:

> I believe that the <u>contents</u> of the letter the Defendant sent to the Court, which I read to you, <u>can be so accurately and readily determined that it cannot be reasonably disputed</u>. You may, therefore, <u>reasonably treat this fact as proven</u>, even though no other evidence has been presented on this point.
>
> As with any fact, however, the final decision whether or not to accept it is for you to decide. You are not required to agree with me.

(Emphases added.) The court's wording was a far cry from judicial notice of the mere fact that a defendant's letter "was entered on the district court's docket as entry ninety-four," which we upheld in Bauzó-Santiago. 867 F.3d at 23 (emphasizing that the noticed fact was "the letter's docketing"). Rather, the court's explanation "reasonably [could have] be[en] understood as an instruction that the contents of the letter [we]re true" rather than the mere fact that "the judge believed the letter was filed on the docket." Id. at 22-23 (emphasis added); cf. United States v. Watson, 695 F.3d 159, 165 (1st Cir. 2012) (affirming judicial notice over Rule 403 objection where the notice was "narrowly confined to the material necessary for" the jury to understand the noticed fact). And the jury heard that instruction not once, but twice: immediately after the government introduced the letter, and then again during the court's formal reading of all the instructions.

The district court, for its part, agreed that the letter did not establish Villa's legal culpability, noting at sidebar that if the letter "were an admission or a conf[es]sion, I wouldn't allow it." Yet the government asked the jury to draw precisely that prejudicial inference from the letter. Cf. Watson, 695 F.3d at 165 (finding no unfair prejudice where "the judge explicitly forbade the government from intimating" an inflammatory inference). In its closing argument, the government explained

- 19 -

that the letter was "an admission," and tantamount to "the Defendant saying, 'I admit to what I have done, and I am in the best position to come to an agreement with the Government in regards to what I have done.'"

We thus agree with Villa that the district court's instruction combined with the government's argument indicated that the "natural and intuitive" inference to draw from the letter was that Villa's interest in a plea agreement meant he was guilty. García-Sierra, 994 F.3d at 34. The jury should not have been "permitted to draw the inference of . . . guilt from the fact that," at the time he wrote the letter, Villa desired to "engage[] in plea discussions." Gotti, 457 F. Supp. 2d at 402. Because the letter's de minimis probative value was substantially outweighed by the unfairly prejudicial effect of its contents, particularly in light of the redactions, we conclude that its admission was an abuse of discretion.

Finally, we cannot agree that the introduction of the letter was harmless. "An error will be treated as harmless only if it is 'highly probable' that the error did not contribute to the verdict." United States v. Kilmartin, 944 F.3d 315, 338 (1st Cir. 2019) (citation omitted). This "case-specific inquiry" directs us to consider "the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases,

and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue." Id. (quoting United States v. Piper, 298 F.3d 47, 57 (1st Cir. 2002)).

Here those factors all point to prejudice. Villa's defense throughout trial was that Herrera and Domínguez were lying about his involvement to curry favor with the government in the disposition of their own criminal troubles. And the government relied on the letter in its closing argument to rebut exactly this defense, arguing that the letter "corroborated the testimony of Harold Dom[í]nguez and Jose Herrera" about Villa's role in the conspiracy. By the government's own framing, the evidence on this point was not "overwhelming." United States v. Ford, 839 F.3d 94, 110 (1st Cir. 2016). And the government was right on that score. It pointed to only one other piece of evidence for corroboration: Mapula's arrest at JFK, transporting a shipment that included two kilograms of cocaine in which Villa allegedly had invested. But it was Herrera who connected Mapula to Villa by testifying that Villa was an investor in that shipment. The government did not present to the jury any physical evidence -- airline tickets, hotel reservations, cell phone records, seized drugs, or anything else -- tying Villa to the conspiracy. Cf. United States v. Colon, 744 F.3d 752, 759 (1st Cir. 2014) (holding that any instructional error relating to confession was harmless, in part because

- 21 -

confession was "buttressed by physical evidence").  The letter, accordingly, was the only evidence wholly independent of Villa's alleged co-conspirators' testimony.[9]

What's more, the government, faced with multiple options for how to present the letter to the jury in closing, chose to style the letter as a confession, enhancing the prejudicial nature of the letter in two important ways.  First, the "presentation of improper material at the end of trial 'magnifie[s]' its prejudicial effect because it is 'freshest in the mind of the jury when [it] retire[s] to deliberate.'"[10]  Zapata v. Vasquez, 788 F.3d 1106, 1122 (9th Cir. 2015) (alterations in original) (citation omitted). Second, and more fundamentally, the government invoked the unique power of confessions to influence a jury's perception of a defendant's culpability.  A defendant's confession is "probably the most probative and damaging evidence that can be admitted against him[,] . . . so much so that we may justifiably doubt [the jury's] ability to put [it] out of mind even if told to do so." Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (quoting Bruton v.

---

[9] As we will explain momentarily, the testimony from Guillermo Salas and Guillermo Cuba pertaining to events in Florida also should have been excluded, and our assessment of the letter's harmfulness is restricted to the "properly admitted evidence" against Villa.  Kilmartin, 944 F.3d at 338.

[10] In addition to featuring in the government's closing argument, the letter also was the last evidence admitted before the jury received its instructions.

<u>United States</u>, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)). Thus, we have previously explained that "by nature," confessions are "likely to be at the center of a jury's attention." <u>United States</u> v. <u>Leon-Delfis</u>, 203 F.3d 103, 112 (1st Cir. 2000). In light of that uniquely forceful effect, we cannot say it is "highly probable" that the inflammatory and misleading letter "did not substantially sway the jury." <u>Kilmartin</u>, 477 F.3d at 338 (citation omitted). Villa is entitled to a trial untainted by its effect.

## B.    The Florida Testimony

Whereas the letter was the last piece of evidence the government presented to the jury, the trial began with testimony about a sting operation involving Villa in Florida. Villa contends that this testimony also should have been excluded by the district court. He argues that the letter and the Florida testimony, which he describes as the two "bookends" of the trial, rendered his trial unfair.

Villa insists on appeal that the Florida testimony should have been excluded as either wholly irrelevant under Rule 401 or as unfairly prejudicial under Rule 403. According to Villa, the Florida testimony involved events that took place outside of the charged conspiracy, and the government elicited the testimony solely to invite the jury to make an unfairly prejudicial propensity inference: that Villa's involvement in the Florida

- 23 -

events made it more likely he participated in the trafficking of cocaine from Puerto Rico to New York. For its part, the government insists that the testimony was relevant because the Florida incident was part of the charged conspiracy, or in the alternative (and in line with the district court's reasoning below), because it was probative of Villa's knowledge or intent related to the cocaine trafficking charge. Because Villa adequately objected, our review is for abuse of discretion.[11]

---

[11] The government contends that we should review this issue for plain error because Villa's counsel allegedly did not preserve this claim by failing to object below. We, however, view the record differently. Villa's counsel objected on relevance grounds as soon as Salas (the government's first witness) started testifying, stating "objection as to relevance . . . 401." We agree with the government that this objection did not preserve the Rule 403 argument Villa presents on appeal. See, e.g., United States v. Iwuala, 789 F.3d 1, 7 (1st Cir. 2015). But Villa offered a more specific objection as soon as Salas began to testify about the traffic stop, reiterating that there had been no "information" suggesting that the Florida incident was "related in any fashion to the" charges he faced at trial, before the district court interposed a question. The district court understood and addressed Villa's trial and post-trial objections to the Florida testimony as raising a Rule 403 challenge, and so do we.

Although propensity evidence is often challenged under Federal Rule of Evidence 404(b), Villa made no objection under that rule at trial or on appeal, and he confirmed as much at oral argument before us. Accordingly, we review Villa's propensity arguments under Rule 403, but not under Rule 404. Nevertheless, we agree with Villa that we may review through a Rule 403 lens whether the district court abused its discretion by understating the risk that the jury would infer criminal propensity from the Florida testimony. We have long and often considered whether other-act evidence must be excluded under Rule 403, despite having at least a scintilla of probative value for a non-propensity

- 24 -

As before, we begin by evaluating the evidence's probative value. At trial, the government contended that the Florida incident <u>was</u> part of the charged conspiracy and was therefore relevant to proving its existence. According to the government and the district court, the Florida incident occurred "during the timeframe of the conspiracy" charged in the indictment, which did not "restrict the scope of the conspiracy to the transportation of cocaine from Puerto Rico to New York."

The government's arguments about the scope of the indictment do not stand up. When analyzing whether a particular event was part of a charged conspiracy, we look to the "temporal proximity and factual similarity" between the event and the conspiracy described in the indictment,[12] including by analyzing whether the incident employed similar "means" in service of a

_____

purpose under Rule 404(b), because of a risk that the permissible relevance of the evidence would still "lur[e]" the jury "into forbidden propensity reasoning." <u>García-Sierra</u>, 994 F.3d at 33; <u>see also</u> <u>Varoudakis</u>, 233 F.3d at 122; 22A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 5259 (noting that "appellate judges can still reverse by finding [the] trial judge abused [their] discretion" in evaluating the propensity risk of other-act evidence under Rule 403).

[12] Our case law has sometimes phrased the analysis as evaluating "the remoteness in time of the other act and the degree of resemblance to the crime charged" as part of the Rule 403 analysis of the probative value of prior bad acts when evidence of that act is admitted for a proper purpose. <u>See, e.g.</u>, <u>Varoudakis</u>, 233 F.3d at 119 (quoting <u>United States</u> v. <u>Frankhauser</u>, 80 F.3d 641, 648 (1st Cir. 1996)).

similar "purpose" as the charged offense.  United States v. Escobar-de Jesus, 187 F.3d 148, 168 (1st Cir. 1999).  Although the Florida incident fell within the general timeframe of the indictment and arguably shared a common "purpose" related to illegal trafficking in cocaine, it plainly involved entirely different "means."  The indictment identifies only two means of transporting cocaine "to the continental United States": The conspirators (1) "traveled on commercial flights that departed from the Luis Munoz-Marin International Airport in Carolina, Puerto Rico [to the continental United States] . . . with kilograms of cocaine concealed inside suitcases," and (2) "mailed controlled substances to," as opposed to within, "the continental United States."  (Emphases added.)  Neither description encompasses the facts underlying the Florida incident, i.e., an attempt by Villa alone, without any apparent involvement by anyone in the Concepción organization, to purchase cocaine within the continental United States.  Cf. Escobar-de Jesus, 187 F.3d at 168 (affirming that an incident was relevant "as an additional overt act within the conspiracy charged" because the incident "stemmed from the same conspiratorial agreement to import and distribute cocaine").

The testimony is not spared, as the government contends, by the fact that the indictment merely stated that the conspiracy's means "included, but w[ere] not limited to" mailing or transporting

cocaine from Puerto Rico to the continental United States on commercial aircraft. The government points to no trial evidence (nor could we find any) that "connected" the Florida testimony to the conspiracy charged in the indictment other than Villa's mere presence. United States v. Lynn, 856 F.2d 430, 435 (1st Cir. 1988) (reversing district court where the government failed to show prior bad act was part of "a continuing or connected scheme of marijuana importation on the part of the defendant"). Neither Herrera nor Domínguez testified that any of the narcotics trafficked, whether by mail or by commercial air carrier, originated in Florida, and neither Salas nor Cuba testified about the intended destination of the cocaine Salas purported to sell to Villa. Further, other than Villa, the "participants in both events were entirely different," and there is no evidence any other co-defendant was involved in the Florida incident. Id.; cf. United States v. Robles-Alvarez, 874 F.3d 46, 50-51 (1st Cir. 2017) (concluding that evidence of defendant's participation in drug-trafficking incident was part of the charged conspiracy because it involved, inter alia, all of the same co-conspirators). As Villa points out, none of the participants in the Florida events (other than himself) were indicted in this case. Villa's position is also supported by the government's characterization in its opening statement of the Concepción conspiracy as a "large drug conspiracy that was involved

- 27 -

in shipping large quantities, extremely large quantities[,] of kilograms of cocaine from Puerto Rico to New York."

Turning to the government's alternative argument that the Florida incident demonstrated Villa's intent, it is true that the Florida testimony, if believed by the jury, suggested that Villa was prepared to consummate a drug transaction. And the district court defended the admission of the testimony on the ground that it was "probative of [Villa's] intent both to invest in cocaine, and actually distribute it." Yet we conclude "the probative worth of [the Florida incident] toward proving [Villa's] intent to commit the instant offense is difficult to conceptualize," absent a propensity inference. Lynn, 856 F.2d at 436. In any event, the government had other avenues of proving intent without the Florida incident because the jury could have "believe[d] the testimony of" Herrera, who testified that he and Villa had worked as couriers together between 2005 and 2007.[13]

---

[13] Villa separately argues on appeal that Herrera's testimony concerning his and Villa's trafficking activities between 2005 and 2007 also should have been excluded as propensity evidence. But we have held that earlier illegal conduct involving the same co-conspirators is "relevant . . . [to] the background of the illegal relationship." United States v. Flemmi, 402 F.3d 79, 89 (1st Cir. 1999); see also Robles-Alvarez, 874 F.3d at 51 (explaining that earlier criminal conduct may be relevant to how the "co-conspirators came together" and why the leader "trusted [the defendant] and decided to go into business with [him]"). And Villa offers no reason to think that testimony was otherwise unfairly prejudicial if used for that purpose.

Id.; cf. United States v. Crocker, 788 F.2d 802, 804 (1st Cir. 1986) (holding that defendant's prior criminal involvement with identical co-conspirator was admissible because it was probative of defendant's intent in the charged crime). In light of Herrera's account, the Florida testimony was "cumulative" and, therefore, of lesser probative value than it otherwise might have been. Kilmartin, 944 F.3d at 337.

Whereas the probative value of the Florida testimony was slight, its potential for unfair prejudice was great. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief, 519 U.S. at 180. "Such improper grounds" justifying exclusion under Rule 403 include "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." Id. at 180-81. Thus, "[t]he overriding policy of excluding [propensity] evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of the issues, unfair surprise and undue prejudice." Id. at 181 (quoting Michaelson v. United States, 335 U.S. 469, 475-76 (1948)).

Here, as in Lynn, the "ordinary inference" for the jury to draw from the Florida testimony "would seem very close to the [propensity] inference" that our precedents find so unfairly prejudicial. 856 F.2d at 436. Salas testified almost immediately after the government's opening statement, which made no reference to Florida and characterized the conspiracy as involving trafficking cocaine only from Puerto Rico to New York in suitcases. The jury then heard from Salas and Cuba without any indication that the Florida events were part of the conspiracy. At that point, the reasonable inference for the jury was that Villa had a propensity for trafficking narcotics. The district court thus abused its discretion by fallowing testimony that "added virtually nothing of legitimate value to the government's case" while "fanning the flames of unfair prejudice." Kilmartin, 944 F.3d at 337.

Turning to prejudice, we again conclude that the admission of this evidence was not harmless. Because the Florida testimony was the only evidence independent of the co-conspirator testimony (other than the unfairly prejudicial letter), we cannot say with any "degree of assurance that" it "did not substantially sway the jury." Id. at 338 (citation omitted). This is especially true when the Florida incident was the only topic on which two of the government's five witnesses testified, and the government emphasized the testimony in its closing. See id. at 340 (finding

- 30 -

error was not harmless where a "full quarter of the government's witnesses" provided unfairly prejudicial testimony and the "prosecutor's summation made abundant use" of the evidence). Thus, we order a new trial.[14]

### C.    Cross-Examination of Domínguez

Villa has identified one more troubling issue in the proceedings below. He contends that the district court abused its discretion by restricting cross-examination of Domínguez about whether Villa was transporting drugs on the occasions they interacted.

At trial, Domínguez testified that Villa traveled to Puerto Rico to deliver drugs "four or five times," that Villa participated in a discussion about how to address Mapula's missing money, and that other mules told him that Villa had traveled with them carrying drugs. But in 2016, Domínguez told the grand jury that he picked up Villa only once, and that Villa "didn't come as a mule. He came to pick money up."

Despite multiple requests by Villa's counsel, the district court would not allow cross-examination about whether Domínguez's trial and grand jury testimony were inconsistent as to

---

[14] Because we conclude that the Florida testimony should have been excluded, we need not reach Villa's arguments that the district court erred by failing to provide the jury with multiple-conspiracy and paid-informant instructions.

- 31 -

whether Domínguez ever picked up Villa carrying narcotics, ruling that to do so would be impermissible impeachment "by omission." Instead, the district court permitted Villa to question Domínguez about whether Villa "was sent . . . to get some money," but not to "ask him whether that means that he didn't bring any drugs, because that's impeachment by omission." Villa was barred, in the district court's words, from cross-examining Domínguez "about things that he did not say in the Grand Jury."

Before we turn to the legal standard for impeachment by omission, however, we pause to note that the dispute here was not about an omission at all. To be sure, impeachment by omission occurs when a party seeks to impeach a witness's trial testimony through evidence of their "previous failure to state a fact in circumstances in which that fact naturally would have been asserted." Jenkins v. Anderson, 447 U.S. 231, 239 (1980); accord United States v. Meserve, 271 F.3d 314, 320-21 (1st Cir. 2001) (citation omitted). But the transcript of Domínguez's grand jury testimony makes apparent that Domínguez contradicted himself at trial on the precise issue that Villa was attempting to highlight through cross-examination. Villa sought to impeach Domínguez with Domínguez's grand jury testimony that Domínguez had picked up Villa "only once. [Villa] didn't come as a mule. He came to pick money up." In context, the express statement that Villa "didn't come as a mule," before immediately stating that Villa "came to pick money

- 32 -

up," was obviously meant to convey that Villa had not come with drugs. And if there was any doubt, the government immediately confirmed at the grand jury: "Okay so he didn't bring drugs from Puerto Rico to New York. He brought money from New York to Puerto Rico?" "Exactly," said Domínguez. Because Domínguez testified directly to this point (money versus drugs), there was no reason to invoke the impeachment-by-omission framework. The necessary analysis under Federal Rule of Evidence 613 merely required an assessment of whether the grand jury testimony was inconsistent with what Domínguez had said on the stand, and because the grand jury testimony was "'irreconcilably at odds' with the [statement] made at trial," impeachment on that ground was proper. United States v. Ramos-Baez, 86 F.4th 28, 58 (1st Cir. 2023) (citation omitted); see also United States v. Torres-Colón, 790 F.3d 26, 30 n.2 (1st Cir. 2015) (explaining that a prior statement need "not be directly contradictory in order to be deemed inconsistent" (citation omitted)).

Even if we set aside the omission/not-omission dispute, we still cannot affirm the district court's ruling limiting the cross-examination. "Common law traditionally . . . allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." Jenkins, 447 U.S. at 239. Thus, we have held that when "[p]rior statements . . . omit details included in a

- 33 -

witness's trial testimony," the question of whether the omission creates an inconsistency with trial testimony turns on whether "it would have been 'natural' for the witness to include the details in the earlier statement."  Meserve, 271 F.3d at 320-21 (quoting United States v. Stock, 948 F.2d 1299, 1301 (D.C. Cir. 1991)); accord Ramos-Baez, 86 F.4th at 58 (citation omitted).  Whether it was "natural" hinges "on the 'nuances of the prior statement's context, as well as [the witness's] own loquacity.'"  Meserve, 271 F.3d at 321 (alteration in original) (quoting Stock, 948 F.2d at 1301).  Naturalness may also turn on the importance of the details elicited at trial that were omitted in the earlier statement: It is more natural to omit "peripheral" details than to omit details pertaining to "core issue[s]."  United States v. Catalán-Roman, 585 F.3d 453, 467-68 (1st Cir. 2009) (opinion of Lipez, J.) (quoting Meserve, 271 F.3d at 321).

At sidebar on the government's objection, the district court ruled categorically that "you cannot impeach by omission." In so ruling, the court never analyzed whether any "omission" by Domínguez was natural in the context of his grand jury testimony. Thus, the district court interpreted the Rule 613(a) standard as erecting an absolute bar to impeachment by omission.  As we have explained, that position is contrary to common law tradition and our precedent.  See Jenkins, 447 U.S. at 239; Meserve, 271 F.3d at 320-21.

- 34 -

The district court recognized the error in its categorical approach at sidebar in its later order denying Villa's request for a new trial on this ground, concluding "the Court did not abuse its discretion in proscribing Villa's attempt to impeach by omission."  The court reasoned that "[t]he question" Domínguez was asked by the government before the grand jury -- "how do you know [Villa]?" -- "d[id] not call for an exhaustive account of every encounter between Domínguez and Villa."

Although correcting its earlier ruling that impeachment by omission is never permissible, the district court still did not apply the naturalness inquiry consistent with our case law.  The district court focused solely on the question posed by the government, when Meserve directs courts to analyze whether the "prior statement's context" means it "would have been 'natural' for the witness to include the details in the earlier statement." 271 F.3d at 321 (emphases added) (citations omitted).  In an analysis focused on the naturalness of a "statement," the district court should analyze both the question and the statement itself.

We also note that, during the grand jury proceedings, the government asked Domínguez no fewer than four questions relevant to the naturalness inquiry, but the district court analyzed only one of them.  The relevant back-and-forth before the grand jury was prompted by the following question from the government: "Can you name the different mules that you have picked

up during the period of time [covered by the indictment]?"  After Domínguez agreed, the prosecutor specified that "when you mention the mule[,] if you can mention approximately how many trips you have been [sic] picked them up at the airport."  One page of material following that question, which we assume contained questions and testimony about other couriers, is redacted from the grand jury transcript.  The government then asked:

| | |
|---|---|
| **Government:** | How about [Villa]? |
| **Domínguez:** | [Villa], only once.  He didn't come as a mule.  He came to pick money up. |
| **Government:** | Okay so he didn't bring drugs from Puerto Rico to New York.  He brought money from New York to Puerto Rico? |
| **Domínguez:** | Exactly. |

(Emphases added.)  Then, the government showed Domínguez a photo of Villa, and asked:

| | |
|---|---|
| **Government:** | Do you recognize that person? |
| **Domínguez:** | Yes, sir. |
| **Government:** | Who is that? |
| **Domínguez:** | That is [Villa]. |
| **Government:** | How do you know [Villa]? |
| **Domínguez:** | He was sent as a mule to get some money. |
| **Government:** | Do you remember on how many occasions? |
| **Domínguez:** | Approximately only once. |

| | |
|---|---|
| **Government:** | And who sent him? |
| **Domínguez:** | [Herrera] did. |
| **Government:** | To <u>pick up money</u> related to the distribution of narcotics? |
| **Domínguez:** | <u>Yes</u>, sir. |

(Emphases added.)

The full context of Domínguez's prior statement clarifies that the government's questions could well have invited the purportedly omitted testimony. See Meserve, 271 F.3d at 321. The colloquy began with the government's request for information about how many times Domínguez had picked up "different mules." When asked about Villa, Domínguez answered, "only once." But because the government had asked about picking up "mules," Domínguez clarified (voluntarily) that Villa "didn't come as a mule"; he "came to pick money up." To the extent this statement was an omission at all, the detail it omitted was the fact that Villa did not come to deliver drugs; a mule delivers drugs, and as Domínguez explained, Villa didn't "come as a mule." The government understood it that way, confirming: "Okay so he didn't bring drugs from Puerto Rico to New York. He brought money from New York to Puerto Rico?" To which Domínguez replied: "Exactly." Cf. id. (finding no abuse of discretion in restricting impeachment by omission because witness "was not asked" about the omitted details before the grand jury). Thus, aware that Domínguez had implied that Villa had never traveled from Puerto Rico to New York to

- 37 -

deliver drugs, the prosecutor sought explicit confirmation of precisely that fact.

The question of whether Villa had ever brought drugs to New York was material to contested issues, not "peripheral" like the omitted grand jury testimony in Meserve. 271 F.3d at 321. The omission went not only to Domínguez's credibility but also to Villa's criminal liability and to facts that would drive his sentence. See Catalán-Roman, 585 F.3d at 467-68 (opinion of Lipez, J.) (arguing it was an abuse of discretion to restrict impeachment by omission that implicated an element of the offense and the availability of capital punishment). Indeed, Domínguez's testimony provided the only corroboration for Herrera's description of Villa's travel to New York on three occasions as a courier, and one or two as a "watcher." And the district court, in turn, relied on Domínguez's and Herrera's testimony in its drug-quantity calculation at sentencing. With Domínguez already on the stand and his material omission laid bare in the transcript of the grand jury proceeding, the district court abused its discretion by limiting his cross-examination; the "significance of [any] omissions was a jury issue." Id. at 468; see also id. at 477 (opinion of Boudin and Stahl, JJ.) ("Typically, latitude is allowed in cross-examining the witness already on the stand whose reactions may be grist for the jury.").

The government contends that any error here was harmless because Domínguez had agreed before the grand jury that Villa "didn't bring drugs from Puerto Rico to New York.  He brought money from New York to Puerto Rico."  Because that statement contained no omission, the argument goes, it was outside of the district court's ruling on the objection, and so Villa should have impeached Domínguez with it after the sidebar.  See Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir. 2003) (holding that defendant was not prejudiced where he had "ample evidence of a witness's story changing over time, but chose not to utilize it").  The flaw in the government's position is that the statement Villa sought to impeach with -- that he "didn't come as a mule" -- also was not a true omission, yet the district court prohibited Villa from pursuing his cross-examination under the auspices of Meserve.  The transcript makes clear that the district court was firm in its ruling and indicated that defense counsel needed to move on.  In fact, the district court explicitly told defense counsel, "[n]o, you can't impeach by omission.  How many times do I have [to] tell you?"  Under these circumstances, we think counsel reasonably could have assumed that any further pursuit of the impeachment would only signal disrespect for the court's decision.  Because the district court's other evidentiary errors already warrant a new trial, we need not say more on the issue, except that in any

proceedings that follow this appeal, Villa should be permitted to attempt impeachment along these lines.

## IV. CONCLUSION

For the reasons discussed, we **reverse** the entry of final judgment, **vacate** Villa's conviction, and order a new trial.[15]

---

[15] Because we conclude that Villa is entitled to a new trial, we decline to address the procedural and substantive reasonableness challenges to his sentence that he raises in his opening brief, his argument that the district court erred by limiting his cross-examination of Herrera regarding Herrera's alleged bail violation and revocation, and his unpreserved Brady challenge that he raised for the first time in a separate pro se filing in this court. See United States v. Sanabria, 645 F.3d 505, 511 n.7 (1st Cir. 2011); United States v. Bristol-Martir, 570 F.3d 29, 45 (1st Cir. 2009).